**H. Stanley BEACH, Appellant–Respondent,**

v.

**Rose BEACH, Appellee–Petitioner,**

**No. 49A02–9206–CV–276.**

Court of Appeals of Indiana, Second District.

Nov. 7, 1994.

Murray J. Feiwell, Lisa Kay Decker, Feiwell & Associates, Indianapolis, for appellant.

Franklin I. Miroff, Monty K. Woolsey, Miroff, Cross & Ruppert, Indianapolis, for appellee.

## OPINION

SULLIVAN, Judge.

H. Stanley Beach (Stanley) appeals from the denial of his Motion to Dismiss for Lack of Subject Matter Jurisdiction in a support action brought by Rose Beach (Rose), his former wife, and from the trial court's order requiring him to continue paying spousal maintenance.[1] Upon appeal, Stanley pres-

---

1. The instant appeal was originally dismissed by order of this court on December 15, 1992, because the Record of the Proceedings as originally filed did not reflect a valid appointment of the

ents the following Issues for review, which we restate:

I.  Whether an Indiana court has subject matter jurisdiction in a spousal support or maintenance action brought by a mother living in Illinois with her adult child, who is the beneficiary of child support payments, against a father living in Indiana;

II.  whether a pleading entitled "Petition to Docket" is sufficient to confer subject matter jurisdiction upon an Indiana trial court over an Illinois dissolution decree;

III.  whether an Indiana court may modify an out-of-state dissolution decree; and

IV.  whether a clause purporting to terminate a support obligation for lack of timely notice of compliance with conditions will operate to terminate the duty if notification is given two weeks late?

On June 30, 1988, the Beaches' marriage was dissolved by order of the Circuit Court of Cook County, Illinois. Under the decree, Stanley was to pay spousal maintenance to Rose in the amount of $400.00 per month.[2] Stanley's maintenance obligation was to be terminated upon the happening of one of six events, including Rose's remarriage, or cohabitation with a male subsequent to the dissolution. The decree also provided:

"The Wife shall notify the Husband annually in writing on the anniversary date of the entry of a Judgment herein [June 30, 1988] that she has remarried or is not cohabitating pursuant to A.2 hereof. The Wife's failure to do this shall terminate the [$400.00 maintenance] payment provided for in subparagraph A hereof." Record at 24.

temporary judge who presided over the proceedings below. *See Beach v. Beach* (1991) 2d Dist. Ind.App., 604 N.E.2d 656. The appeal was reinstated upon the petition of Rose Beach, whose Petition for Rehearing was accompanied by a supplemental record which contained documents reflecting the valid appointment of the temporary judge in question, said documentation having been omitted from the original record.

On October 6, 1992, Rose Beach filed a Motion to Strike, requesting this court to strike Appendices A and B of Stanley Beach's Reply Brief upon grounds that the materials contained therein are

On June 13, 1990, the above provision was modified by entry of an Agreed Order, purportedly signed by Stanley and Rose. The Agreed Order provides:

"IT IS HEREBY ORDERED

1.  The respondent [Stanley] shall pay to petitioner upon entry of this order the sum of $2,800.00, which sum represents payment in full of any maintenance owed to petitioner by respondent for the period prior to May 31, 1990.

2.  Further, upon entry of this order, respondent shall pay an additional $400.00 representing the maintenance payment due from respondent on June 1, 1990.

3.  Respondent shall commence regular payment of maintenance, as per the original Judgment, on July 1, 1990.

4.  Article II, Paragraph D of the Judgment for Dissolution of Marriage shall be modified to read as follows:

'The Wife will notify the Husband annually, by certified mail, return receipt, with a receipt and postmark dated between June 1 and June 15 of each year, that she has not remarried or is not cohabitating pursuant to Paragraph A 2 of Article II herein. The Wife's failure to do this, except in the case of Wife's incapacity due to serious illness, shall permanently terminate the payment of any additional maintenance pursuant to this Judgment for Dissolution of Marriage or under the Illinois Marriage and Dissolution of Marriage Act.'

5.  The notice referred to in the above Paragraph shall be waived for the year 1990, and the notice requirement shall commence with the period June 1 to June 15, 1991.

wholly irrelevant. That motion is hereby granted.

**2.**  By way of an Agreed Order entered contemporaneously with the Decree of Dissolution, Stanley also was and is obligated to pay to Rose $260.00 per month as child support for an adult child of the marriage. The obligation is to continue so long as the child is residing with Rose on a permanent full-time basis. Although the parties expressly neither agreed nor denied that the child was mentally or physically disable, that issue was apparently contested. The instant action does not affect that child support obligation.

6. Simultaneously, with this order, the Court shall enter a proposed QUADRO order, pursuant to the Judgment for Dissolution of Marriage. Respondent shall promptly provide petitioner's attorney with the name and address of the appropriate pension plan trustees for submission and review of said QUADRO.

7. Each party shall be responsible for his or her own attorney's fees.

8. Except as modified herein, the Judgment for Dissolution of Marriage stands as is.

/s/ Rose Beach, by Robert Schmidt atty.

/s/ Stanley Beach" Record at 5–6.

On July 2, 1991, pursuant to the dissolution decree, Rose sent notification via certified mail that she was neither remarried nor cohabitating. Stanley was notified on July 7[3] that certified mail had been received. He picked up the letter from the post office on July 9. However, because he had not received notification by the June 15 deadline imposed in the Agreed Order, Stanley ceased paying maintenance beginning with the check he should have sent on July 1, 1991.

On November 19, 1991, Rose filed a pleading entitled "Petition to Docket" in the Marion County Superior Court requesting that the court "docket" certain Orders of the Cook County Circuit Court which she had attached to her Petition, and which pertained to the dissolution of her marriage to Stanley. Said orders included the Agreed Order in controversy, a Qualified Domestic Relations Order, the Judgment of Dissolution of Marriage, and a June 30, 1988 Agreed Order pertaining to their adult son.[4]

Contemporaneous with the filing of the Petition to Docket, Rose filed two other petitions. She filed a Petition for Contempt, alleging that Stanley had failed to make maintenance payments since June of 1991, and seeking payment of the alleged arrearage. In addition, Rose filed a Petition for Modification, alleging that the parties' adult child "is physically disabled as per the Orders entered by the Circuit Court of Cook County, Illinois, and is entitled to child support in an amount dictated by the Guidelines of the State of Indiana." Record at 42.[5] Stanley answered on December 13, 1991, by entering an appearance for the purpose of challenging the Marion County Superior Court's jurisdiction, and by submitting a Motion to Dismiss for Lack of Subject Matter Jurisdiction.

On February 28, 1992, the Marion Superior Court entered an order stating that it had jurisdiction of the controversy. The court also addressed the merits of Rose's argument that the modified forfeiture provision contained in the June 13, 1990 Agreed Order did not operate to terminate Stanley's obligation to pay maintenance:

"[T]he intent of the provision regarding maintenance and notification to Respondent [Stanley] was to ensure that Respondent would not be paying maintenance to the Petitioner if she were remarried or cohabitating with someone. The evidence conflicted regarding whether the Petitioner was aware of the new agreement entered in this cause providing that she give notice to the Respondent between June 1 and June 15 of each year regarding whether she was remarried or cohabitating with someone. Petitioner testified that she did not recall the entry of that agreement, nor did she recall being notified promptly of the date change. Respondent testified that he was aware of the entry a few days after it had been submitted and signed. The agreed entry was submitted to this Court, and this Court notes that neither

---

3. This information is derived from Stanley's testimony under oath at a February 5, 1992 hearing upon his Motion to Dismiss. Stanley was questioned as to the day that he actually received notice that the letter was at the post office to be picked up. He responded that the appropriate date was June 7. However, it is obvious from the context of his testimony that he meant to say July 7, not June 7.

4. For the sake of clarity, unless otherwise indicated, all future references to an "Agreed Order" refer to the June 13, 1990 Agreed Order modifying the forfeiture of maintenance clause.

5. Although is is not so stated, Rose would presumably be entitled to receive more than the $260.00 reflected in the June 30, 1988 Agreed Order if the court were to award her the amount arrived at by application of the Indiana Child Support Guidelines.

party signed the document. In fact, it was signed on behalf of each party by their respective attorneys.... [6]

4. The evidence indicated that the intent of the paragraph of the notification provision was to ensure that Respondent would not pay Petitioner the maintenance should she be remarried or cohabitating with someone. Although the notice provided by Petitioner was mailed one day after the deadline, this Court feels the spirit of the provision remains intact. Petitioner is not remarried or cohabitating with someone, and the Respondent has not been unduly prejudiced in any way.

5. The Respondent is in arrears in payments of maintenance.... Respondent is ordered to pay to the Petitioner the amounts he is in arrears at the rate of an additional $150.00 per month until said arrearage is paid in full.

\* \* \* \* \*

8. The Court hereby orders the parties to adhere to the June 1 to June 15 timeframe as set out in the Agreed Entry henceforth." Record at 74–75.

In effect, the trial court found that 1) it had jurisdiction, 2) the forfeiture clause of the Agreed Order had not been triggered, and 3) Stanley was in arrears in the amount of maintenance he had failed to pay after June 1991. It is from this order which Stanley appeals.

### I. *Subject Matter Jurisdiction*

■ Stanley argues that "[t]he Circuit Court of Cook County, Illinois retains exclusive jurisdiction to hear proceedings to enforce its Judgment of Dissolution of Marriage and subsequent Agreed Entry, where Wife and the parties' adult son, who is the subject of child support, both continue to reside in Cook County, Illinois." Brief of Appellant at 8.

6. We note that this conclusion is at odds with the signature page of the Agreed Order. As earlier observed, the instrument purports to have been signed by Stanley, not by his attorney.

7. Stanley's challenge is to the Marion County Superior Court's subject matter jurisdiction,

In support of his argument, Stanley offers *Smith v. Smith* (1992) 1st Dist. Ind.App., 594 N.E.2d 825. In *Smith,* the marriage of husband and wife was dissolved by order of an Indiana court. The court awarded custody of the children to wife. Thereafter, wife and the minor children moved to Florida and brought an action in a Florida court seeking modification of custody and visitation. Our First District held that Indiana, not Florida, had jurisdiction to modify the original decree under the Uniform Child Custody Jurisdiction Act (UCCJA). Indiana's version of the UCCJA is codified at Indiana Code 31–1–11.6–1 *et seq.* (Burns Code Ed.1987 & Supp. 1994) and is called the Uniform Child Custody Jurisdiction Law (UCCJL). The issue of modification of a foreign custody determination is specifically addressed in the UCCJL, see I.C. 31–1–11.6–14 (Burns Code Ed.1987), and that provision guided our First District in its determination. However, the instant case does not involve a custody dispute, thus the UCCJL does not apply. *See* I.C. 31–1–11.6–2(2). Rather, this is a spousal support action, and the relevant statutory guidelines, including a description of the extent and nature of a trial court's jurisdiction, are found in the Uniform Reciprocal Enforcement of Support Act (URESA), codified at I.C. 31–2–1–1 *et seq.* (Burns Code Ed.1987 & Supp.1994).[7]

Indiana Code 31–2–1–1 states that the purpose of URESA is to "improve and extend by reciprocal legislation enforcement of duties of support and to make uniform the law with respect thereto." Inasmuch as this is an action concerning enforcement of the Illinois order of spousal support, the Marion County Superior Court correctly determined that it had jurisdiction. *Crouch v. Kolkman* (1991) 3d Dist. Ind.App., 573 N.E.2d 899, 901.

### II. *Petition to Docket*

■ Stanley argues that Rose's Petition to Docket was insufficient to confer upon Marion County Superior Court jurisdiction over

which is the "power to hear and decide cases of the general class to which the proceedings then before the court belong." *In re Marriage of Truax* (1988) 1st Dist. Ind.App., 522 N.E.2d 402, 405 (jurisdiction over URESA actions is subject matter jurisdiction).

the instant action. In essence, Stanley challenges Rose's compliance with the provisions governing institution of URESA actions.

In terms of the case before us, the following definitions set forth in I.C. 31–2–1–2 are of particular significance:

"(b) 'Initiating state' means any state in which proceeding pursuant to this or a substantially similar reciprocal law is commenced.

(c) 'Responding state' means any state in which any proceeding pursuant to the proceeding in the initiating state is or may be commenced.

\*    \*    \*    \*    \*    \*

(k) 'Rendering state' means any state in which a support order is originally entered.

(*l*) 'Registering court' means any court of this state in which the support order of the rendering state is registered."

The basic remedy for enforcement of support under URESA is found at I.C. 31–2–1–11 *et seq.* These provisions contemplate the filing of a complaint in the "initiating state" and upon examination of the complaint or petition the court may forward the matter to the "responding state". A different procedure is provided under I.C. 31–2–1–35 *et seq.* This procedure involves the registration of a support order issued by a foreign state. It is a remedy applicable only when there is a foreign support order. It is in addition to the remedy dealing with initiating and responding states, which can be used whether or not there is a pre-existing foreign support order.

The initiating-responding method is set forth in I.C. 31–2–1–14 *et seq.* It contemplates that a petition which claims that respondent owes a duty of support and that the responding state may obtain jurisdiction over respondent be filed in the initiating state. The court in the initiating state then merely certifies that the petition sets forth facts from which such determinations might be made, attaches copies of the complaint and its own certificate and transmits those documents to the responding state. The responding state then makes the factual determination and if appropriate may enter a support order. I.C. 31–2–1–23. This scenario seems to contemplate that a support order has not been entered in the initiating state, although use of this method is not precluded when there is an existing support order which has issued in a state other than the initiating or responding state.

The initiating-responding method is not, therefore, restricted to a two-state scenario. For example, State A could be the "rendering" state entering an original support order. That order could be the basis of a petition filed in State B, (perhaps the residence of the obligee) as the initiating state, with certification and forwarding of the complaint for factual determination to the responding state, State C, the residence of the obligor. Thus, the initiating-responding scenario can be used whether or not there is a pre-existing support order.

The rendering-registry method clearly contemplates an already existing support order. I.C. 31–2–1–32 specifies that:

"If the duty of support is based on a foreign support order, the obligee has the additional remedies provided in [sections 33–37 inclusive]."

These sections deal with the registration of the foreign support order, and the effect thereof. IC 31–2–1–37 provides that the foreign order as registered may be confirmed by the registering court and as confirmed "shall have the same effect and may be enforced as if originally entered in the court of this state."

The registration procedure is set out in I.C. 31–2–1–35:

"The petition for registration shall be verified and shall set forth the amount remaining unpaid and a list of any other states in which the support order is registered and shall have attached to it a certified copy of the support order with all modifications thereof. The foreign support order is registered upon the filing of the complaint subject only to subsequent order of confirmation."

Depending upon the circumstances, therefore, a state, such as Illinois here, might be not only a "rendering state" but also an "initiating state". Conversely, Indiana, as here, might be not only the state of a "regis-

tering court" but also a "responding state". Indiana could also be an "initiating state" if under the circumstances of a particular case a petition is filed here, seeking to fix a duty of support which might be enforced subsequently by a responding state against the person owing the duty of support.

Given a pre-existing foreign support order, as here, either the initiating-responding method or the rendering-registry method might be used.

Although the registration provisions do not specify the nature or contents of "the complaint" to be filed, it is reasonable to conclude that a complaint identical or similar to that required by I.C. 31–2–1–11 (the initiating-responding method) is contemplated. I.C. 31–2–1–11 (Burns Code Ed.1987) provides:

> "The complaint shall be verified and shall state the name and, so far as known to the complainant, the address and circumstances of the respondent and his dependents for whom support is sought and all other pertinent information. The complainant may include in or attach to the complaint any information which may help in locating or identifying the respondent such as a photograph of the respondent, a description of any distinguishing marks on his person, other names and aliases by which he has been or is known, the name of his employer, his fingerprints, or social security number."

We note at the outset of our analysis of Rose's compliance with URESA that the posture of her action is atypical of those generally filed under URESA. The primary purpose of URESA is to secure support from those legally obligated to pay it. In the typical case, husband and wife are divorced in state A, and the decree imposes a duty of support upon husband. Husband then moves to state B and a dispute arises regarding his support obligation. Under URESA, wife causes the court of state A to forward to the clerk of the court in state B three certified copies of the complaint for support, including a copy of the divorce decree along with all other relevant documents, and a copy of the reciprocal URESA law of state A. I.C. 31–2–1–14 (Burns Code Ed.1987).

The purpose of these proceedings is obvious. First, the responding court, i.e., in this case, the Marion County Superior Court, must be apprised of the fact that a dispute exists. Second, the facts of the dispute must be presented to the responding state court. In this case, such facts are incorporated within the complaint, as provided in I.C. 31–2–1–11. Third, competent evidence must be presented establishing the validity of the claim. The URESA provision setting forth the requirements necessary to initiate actions to collect support is intended to accomplish those ends. The procedural requirements prescribed therein are not to be regarded as meaningless form; to ignore such requirements is to risk dismissal of the URESA action for noncompliance with the statute. However, we are not here inclined to elevate form over substance.

Here, the procedure followed by Rose more closely approximates the rendering state-registering court method. It is apparent, that Rose was bringing the Illinois support determination to Indiana and seeking its enforcement. Accordingly, we determine Rose's compliance with the statute by examining whether her actions accomplished the purposes underlying the statute's registration provisions.

The Petition to Docket contained Stanley's last known mailing address. Contemporaneous with her Petition to Docket, Rose filed both a Petition for Contempt, which set out the disputed support amount, and a Petition for Modification, requesting an increase in the amount of child support Stanley was paying. Additionally, attached to the Petition were copies of the Qualified Domestic Relations Order, the dissolution decree, the June 30, 1988 Agreed Order pertaining to child support, and the June 13, 1990 Agreed Order purporting to modify the termination of maintenance clause contained in the dissolution decree. In short, all of the information contemplated and required by the URESA registration provisions was contained in or attached to Rose's Petition to Docket. We hold that Rose substantially complied with the relevant URESA provisions, and the court properly considered the case upon its merits.

## III. *Modification*

■ Stanley contends that the trial court exceeded its power by effectively modifying the June 13 Agreed Order in ordering him to pay maintenance even though Rose's non-compliance with the notification requirements allegedly terminated his obligation to pay. The URESA statute, unlike Indiana's UCCJL with regard to foreign custody determinations (I.C. 31–1–11.6–14), is silent as to whether an Indiana court may modify a foreign support order.

Our Fifth District recently addressed the same issue in *Burke v. Burke* (1993) 5th Dist. Ind.App., 617 N.E.2d 959. In *Burke*, a marriage was dissolved pursuant to an Indiana decree of dissolution. The man moved to Illinois, where the woman subsequently registered the judgment. The Illinois court eventually ordered the man to pay an amount less than was reflected in the Indiana decree. The man then moved back to Indiana, where he filed a petition to terminate and abate support. The Indiana court denied the petition and calculated the man's arrearage based upon the amount ordered by the original decree, not the reduced amount ordered by the Illinois court. The Indiana court's action was based upon its conclusion that "modification [of the original support order] by any other court is void and not recognized by this Court." 617 N.E.2d at 962. Our Fifth District held that the Indiana court erred in not recognizing the Illinois modification.

The *Burke* majority noted that Illinois has adopted the Revised Uniform Reciprocal Enforcement of Support Act (RURESA) which differs from Indiana's version of URESA most notably in section 31, which equates with I.C. 31–2–1–29. The Illinois provision states:

"A support order made by a court of this State pursuant to this Act does not nullify and is not nullified by a support order made by a court of this State pursuant to any other law or by a support order made by a court of any other state pursuant to a substantially similar act or any other law, regardless of priority of issuance, *unless otherwise specifically provided by the court.*" Ill.Ann.Stat. ch. 750, para. 20/31 (Smith–Hurd 1993) (emphasis supplied).

While noting that the purpose of both RURESA and URESA is "to improve and extend by reciprocal legislation the enforcement of duties of support," the *Burke* majority nevertheless held that the Illinois order modified the original decree. *Burke, supra,* 617 N.E.2d at 962. This, in turn, was based upon the majority's summary conclusion, citing as authority two Illinois Court of Appeals decisions, that "Illinois courts have read RURESA as providing the responding court with the authority to modify foreign support orders if they specify the intent to do so." *Burke, supra,* at 964. But, as Judge Barteau noted in her concurring in result opinion in *Burke,* the Illinois courts have not clearly interpreted section 31 of RURESA as providing courts of responding states with authority to modify foreign support orders even if such an intent is stated in the modification order.

■ Although the phraseology employed in section 31 is susceptible to the *Burke* majority's interpretation, such is inconsistent with the statute's sole stated purpose of improving *enforcement* of support obligations. As Judge Barteau pointed out, her view is apparently shared by the Illinois Supreme Court:

"[I]f a URESA support order constituted a binding modification of the underlying decree then the legislature's laudable objective of providing an additional remedy would be thwarted." *In re Marriage of Gifford* (1988), 122 Ill.2d 34, 118 Ill.Dec. 452, 454, 521 N.E.2d 929, 931.

We thus cannot agree with the posture of the *Burke* majority that Illinois courts have taken the position that, under Illinois's version of RURESA, a responding state's court may modify a foreign support order. We now state that to the contrary, a responding state does not have authority to modify a foreign support decree.

Be that as it may, the *Burke* discussion concerning the effect of the RURESA provision upon modifications by a responding state would appear to be extraneous, except by analogy, to consideration of the authority of a court of registration. In this connection, the

case before us is like *Burke.* In *Burke* the Indiana support order was merely registered in Illinois. There was no separate determination made in Illinois of the duty to provide support, as would have been the case in an initiating-responding state situation. Similarly, Rose merely registered the Illinois support order in Indiana. There was no separate proceeding in which the Indiana court was asked to determine the existence of a duty of support. Nevertheless, the *Burke* majority proceeded to construe the Illinois order as if it were from a responding state and held that if Illinois clearly specified the intent to do so it could permissibly modify the Indiana decree.[8]

As will be set out more fully below, URESA is simply an enforcement tool which was designed to alleviate the problems inherent when a society as mobile as that of the United States makes use of a legal structure comprised of fifty separate judicial systems. In the absence of some measure of uniformity and cooperation among the several states, the time and expense spent litigating support issues would be prohibitive. The *Burke* majority's interpretation of URESA isolates the provision in question from the remainder of the statute and ascribes to it a meaning antithetical to the statute's very purpose. As our court has stated:

"Indispensable to ascertaining the legislature's intent is a consideration of the goals sought to be achieved and the reasons and the policy underlying a statute. It is, therefore, necessary to view a statute within the context of the entire act, rather than in isolation, when construing the statute." *Simon v. Auburn Board of Zoning Appeals* (1988) 3d Dist. Ind.App., 519 N.E.2d 205, 211.

We therefore decline to follow *Burke* based upon our conclusion that the majority opinion is at odds with the underlying purpose of URESA.

In *Kniffen v. Courtney* (1971) 148 Ind.App. 358, 266 N.E.2d 72, this court considered whether an Indiana court could appropriately modify a support order entered by a Kentucky court pursuant to a Kentucky decree of dissolution. Upon its conclusion that the Kentucky court had the power to modify the support order, the *Kniffen* court further concluded that "therefore, the courts of Indiana may modify the support order if conditions presented to the court warrant such action." *Id.* at 76. *Kniffen,* in turn, was cited by our First District in *D.L.M. v. V.E.M.* (1982) 1st Dist. Ind.App., 438 N.E.2d 1023, as supporting the proposition that an Indiana court may modify a foreign support order under URESA.

In *D.L.M.,* the marriage was terminated by an Illinois decree of dissolution. At the time of dissolution, two children had been born of the marriage, and wife was pregnant with a third child. The Illinois court ordered husband to pay support for all three children. Husband subsequently moved to Indiana. When wife brought a URESA action in Indiana, husband denied that he was the father of the third child, and requested that the support amount be reduced accordingly. The trial court entered a finding of non-paternity and thus found no duty of support regarding the third child, a finding affirmed by our First District.[9]

Central to the *D.L.M.* court's analysis was I.C. 31–2–1–29 (Burns Code Ed.1987), which states:

"No order of support issued by a court of this state when acting as a responding state shall supersede any other order of support but the amounts for a particular period paid pursuant to either order shall

---

8. Judge Barteau recognized that a responding state under I.C. 31–2–1–14 through 31–2–1–24 may not modify a foreign decree, but concurred in result in the *Burke* opinion, expressing the view that registration of the foreign order permitted its modification. As noted in her concurring opinion here, while she still holds that belief, she has yielded to the majority view on this issue.

9. Actually, although the effect of the First District's ruling was to affirm the initial finding of non-paternity, this result was achieved by reversing the trial court's reconsideration and reversal of its earlier finding of non-paternity. Our First District held that the earlier finding of paternity could only be challenged upon direct appeal, and thus the trial court could not entertain wife's motion to reconsider the paternity issue once the finding had been made.

be credited against amounts accruing or accrued for the same period under both."

Referring to I.C. 31–2–1–29, the court stated: "This section has been interpreted to mean that the initiating state is not required to grant full faith and credit to the support orders of a responding state when the initiating state considers a subsequent petition for modification or calculates arrearages due under the divorce decree. [Citations omitted.] Support orders of an initiating state can be modified in this state upon proper showing. [Citation omitted.] However, such modifications do not supersede the original order in proceedings before the initiating court." *D.L.M., supra*, 438 N.E.2d at 1029.

*D.L.M.* can be understood to mean that the responding state may modify the initiating state's support order, but that the initiating state need not grant full faith and credit to the responding state's modification. However, such result is inconsistent with the intent of URESA, which is to "improve and extend by reciprocal legislation enforcement of duties of support and to make uniform the law with respect thereto." I.C. 31–2–1–1. In addition, it would seem to invite forum shopping and to create the potential for interstate jurisdictional disputes. A more persuasive view of the meaning of the anti-superseding provision within the overall context of URESA is set out in *Banton v. Mathers* (1974) 3d Dist., 159 Ind.App. 634, 309 N.E.2d 167.

In *Banton*, Oklahoma, as responding state, reduced the amount of support that an Indiana decree of dissolution had ordered a husband to pay. Upon his return to Indiana, husband's ex-wife filed a petition seeking arrearage in the amount of the difference between the reduced amount husband was paying pursuant to the Oklahoma order and the amount reflected in the Indiana decree of dissolution. Our Third District reversed the trial court's ruling that Indiana was obliged to grant full faith and credit to the Oklahoma modification. However, the court did not premise its holding upon the *D.L.M.* rationale, i.e., that Indiana need not recognize the Oklahoma modification. Rather, the court explained, "the authority of the court origi-nally ordering payment is not affected or is its order modified by an order of the court of the responding state fixing another or different sum." *Banton, supra*, 309 N.E.2d at 173 (quoting *Howard v. Howard* (1966) Miss., 191 So.2d 528, 531–32). In other words, when the responding court orders a party to pay an amount of support which differs from the amount reflected in the divorce decree, it is not modifying, or superseding, the original order. The support obligation as defined by the decree remains in force, and any amount collected in the responding state pursuant to its order is to be applied to the amount due under the decree in the initiating state.

This result is in harmony with the general nature of an URESA action. Our courts have consistently stated that the URESA court's jurisdiction is limited to the single issue of enforcement of support. *State ex rel. Vermont Department of Social Welfare v. Cargile* (1989) Ind., 546 N.E.2d 301, 302; *Crouch v. Kolkman* (1991) 3d Dist. Ind.App., 573 N.E.2d 899, 901; *In re Marriage of Truax* (1988) 1st Dist. Ind.App., 522 N.E.2d 402, 405. Moreover:

"[a]n examination of the language of the Uniform Reciprocal Enforcement of Support Act indicates that it is intended as only an auxiliary or supplemental remedy in the courts of a sister state for the enforcement of orders of support. Consequently, the original order of support rendered in the court of the initiating state is unaffected by the orders subsequently rendered in another state under the Uniform Act, except to the extent that payments made pursuant to one must be credited against payments accruing or accrued under the other for the same period or periods." *Banton, supra*, 309 N.E.2d at 172 (quoting *Howard, supra*, 191 So.2d at 531.)

Accordingly, the responding state may act only insofar as the action is one to enforce the support order of the initiating state. It may, for example, conduct a hearing at the request of either party in order to determine the amount of support the obligor is then able to pay. If the responding court determines that it will order the obligor to pay an amount which differs from the amount reflected in the decree, it has not changed the

amount which the obligor is required to pay under the decree in the initiating state; it has merely determined that the obligor is then capable of paying only a portion of that amount. However, if the amount determined in the responding state is less than the original amount, and the obligor pays only that amount, the obligor accumulates an arrearage in the initiating state equal to the difference between the amounts reflected in the two support orders.

■ In short, a court in a responding state may not modify a foreign support order in a URESA action. Similarly, a registering court is without such authority, at least to the extent that such a modification would be entitled to recognition and enforcement in the rendering state.

To the extent that Indiana, as a state of registry, may effect a modification, it may do so only with respect to the manner of enforcement of the foreign support order as confirmed. The registering court may not modify the foreign order and as modified confirm it. It may merely confirm the order in its existent form. To the extent that the confirmed foreign support order becomes a judgment as if originally entered in Indiana, modification thereafter may only affect its status as enforceable in Indiana. It does not and cannot modify the Illinois judgment as confirmed. The only authority vested in the Marion Superior Court, Civil Division IV was to confirm the Illinois support order as it existed when registered. That confirmation would necessarily carry with it confirmation of all its terms and provisions.

IV. *Termination of Maintenance Clause*

■ The fact that a court in the responding state or, as here, in the registering state, is limited, under URESA, to matters pertaining to enforcement of support orders, however, does not limit that court to deciding only whether the foreign judgment is valid, or what portion of the amount reflected in the decree will be ordered to be paid. In order to perform its task under URESA, the court in the responding state or in the state of registration must also consider the decree itself in order to fashion relief which is not inconsistent with (i.e., does not supersede) the provisions of the original decree.

■ In the instant case, Stanley's petition required that the trial court determine whether the forfeiture provision in the Agreed Order terminated Stanley's duty to pay maintenance upon Rose's noncompliance with the notification time requirement. That decision, in turn, could only be made after examining the decree itself, as well as the law pertaining thereto.

When determining whether the forfeiture clause terminated Stanley's duty to pay maintenance, we must apply the law of Illinois, inasmuch as that court explicitly retained jurisdiction over support matters addressed in the decree. *Weber v. Harper* (1985) 3d Dist. Ind.App., 481 N.E.2d 426, 429, *trans. denied.* In the sense maintenance is a "support matter".

We note first that the forfeiture language contained in both the original decree of dissolution and in the June 13 Agreed Order is clear, and the meaning unmistakable. Both require that notification be sent by a specified date, and both state that failure to meet the time requirement will result in permanent termination of Stanley's duty to pay maintenance. Because the meaning is clear, we are not free to "interpret" the language of the decree to mean anything other than failure upon Rose's part to comply with the time element terminates Stanley's duty to pay. *See Jackson v. DeFabis* (1990) 1st Dist. Ind. App., 553 N.E.2d 1212. However, our analysis does not end here. We must next determine whether, under Illinois law, the forfeiture clause is to be given effect.

This action is governed by the Illinois Marriage and Dissolution of Marriage Act (IMDA), Ill.Ann.Stat. ch. 750, para. 5/101 *et seq.* Explicitly included among the Act's purposes are to "mitigate the potential harm to the spouses and their children caused by the processes of legal dissolution of marriage" and to "make reasonable provision for spouses and minor children during and after litigation." Ill.Ann.Stat. ch. 750, para. 5/102(4) & (5). IMDA also provides that its provisions should be liberally construed to promote said purposes. *Id.*

Under Illinois law, upon dissolution of marriage, a court may award alimony, or maintenance, in addition to child support. Ill.Ann.Stat. ch. 750, para. 5/504. IMDA provides that, after spousal support has been ordered, the occurrence of one of several events operates to terminate as a matter of law that obligation:

"Unless otherwise agreed by the parties in a written agreement set forth in the judgment or otherwise approved by the court, the obligation to pay future maintenance is terminated upon the death of either party, or the remarriage of the party receiving maintenance, or if the party receiving maintenance cohabits with another person on a resident, continuing conjugal basis." Ill.Ann.Stat. ch. 750, para. 5/510(c) (Smith–Hurd 1993).

Thus, it is clear that an Illinois court would sanction the termination of maintenance upon the happening of one of the aforementioned events; indeed, unless the parties expressly agree to the contrary, such termination is accomplished as a matter of law. However, it does not necessarily follow that Illinois courts regard the payment of maintenance lightly. The IMDA itself expressly identifies support of an ex-spouse subsequent to divorce as one of the Act's highest priorities. *See* Ill.Ann.Stat. ch. 750, para. 5/102. This prioritization is grounded in public policy. The decision to terminate, therefore, must be consistent with sound public policy.

Our research does not reveal a case which affirms, or even addresses, the termination of maintenance based solely upon untimely notice. Rather, Illinois cases addressing an obligor's petition to terminate maintenance almost universally include an evaluation of the parties' financial status, except when the petition is based upon the occurrence of one of the terminating events listed in section 510(c). The factors to be analyzed when addressing termination or modification of maintenance illuminate the nature of the public policy consideration. Included are the financial resources of the party seeking maintenance, the standard of living during the marriage, duration of the marriage, the age and physical and emotional condition of the parties, the ability of the spouse seeking maintenance to meet his or her financial needs independently, and the ability of the other spouse to pay. *In re Marriage of Lehr* (1991) 217 Ill.App.3d 929, 160 Ill.Dec. 840, 578 N.E.2d 19. In light of the factors to be considered, it is clear that the court's decision is equitable in nature, involving a weighing of the relevant considerations. We discern neither a preoccupation with form, see, *e.g., In re Marriage of Caradonna* (1990) 197 Ill.App.3d 155, 143 Ill.Dec. 175, 553 N.E.2d 1161, nor a legalistic approach suggesting that arbitrary deadlines, rather than need and ability to pay, should prevail.

In the instant case, the termination provisions in both the Agreed Order and the dissolution decree contemplate that Rose notify Stanley in the event that she remarry or cohabitate with a male. Continuance of her unmarried status or her lack of cohabitation is not a triggering event. The requirement for annual notices merely serves to obligate the former wife to keep the obligor husband advised as to her status. The import of that notification lay in the content of the message, not the time of receipt. That is, the message was important because it verified to Stanley that two conditions upon which maintenance would be terminated had not occurred, thus his obligation to pay continued. We discern no reason of independent significance, nor does Stanley offer any such, that the notice be received by June 30, June 15, or any other date for that matter. Rather, it appears that those dates were chosen only because they were approximate anniversary dates of the dissolution decree and Agreed Order, respectively. Be that as it may, Stanley's position was not materially different whether he received the notice on June 1 or July 1. In other words, time was not of the essence of the notification provision. Rose's marital status and living arrangements, on the other hand, *were* of the essence of the notice provision. Therefore, the import of the notice requirement was that Stanley be apprised that Rose was not, in fact, remarried or cohabitating and thus know of his continuing maintenance obligation. We conclude that the purpose of the notice provision was fulfilled by the July 2 (or July 7) letter of notification, and that the delay, whether two days or two weeks, was *de minimis.*

Therefore, in view of the *de minimis* nature of Rose's tardiness in sending notice, and in view of the public policy considerations heretofore discussed, the trial court correctly ruled that Stanley's obligation to pay maintenance was not terminated by Rose's untimely notice.

The judgment is affirmed.

BARTEAU, J., concurs in result with separate opinion.

STATON, J., concurs in result and joins the separate opinion of BARTEAU, J.

BARTEAU, Judge, concurring in result.

While I still believe, as I expressed in *Burke v. Burke* (1993), Ind.App., 617 N.E.2d 959, that the intent in enacting the registration provision was to provide an additional remedy, and that modification by the registering court was contemplated, the majority of courts addressing this issue have held to the contrary and I will yield to their wisdom.

STATON, J., concurs.