**Charles L. CRAWFORD, Appellant (Defendant Below),**

v.

**STATE of Indiana, Appellee (Plaintiff Below).**

No. 49S00–9406–CR–594.

Supreme Court of Indiana.

June 28, 1996.

---

Belle T. Choate, Indianapolis, for Appellant.

Pamela Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, for Appellee.

SULLIVAN, Justice.

Defendant, Charles L. Crawford, was convicted in February, 1994, of the November, 1964, murder of an Indianapolis cab driver. Finding that no violation of defendant's constitutional or statutory rights occurred as a result of the delay in bringing him to trial, and for the other reasons discussed below, we affirm his conviction and sentence.

### Background

On the evening of February 3, 1965, police officers in Texarkana, Texas, noticed an older model Pontiac with a broken back window. Glass fragments could be seen outside the car. The officers had never seen the car in Texarkana before and noticed that the car had a wired-on Indiana license plate. The wired-on license plate raised the officers' suspicion that the car may have been stolen. When the officers looked inside the car, they noticed a considerable amount of blood. Of-

ficer Gary Collvins was ordered to watch the car and check the area in an attempt to locate the driver.

About two hours later Officer Collvins noticed defendant walking in an alley. Officer Collvins testified that he thought defendant was the driver of the car because defendant was wearing heavy clothing and boots more suitable for Indiana's winter weather than the Texas winter climate.

Officer Collvins approached defendant and asked him if the Pontiac was his car. Defendant initially stated that the car was not his. When asked for identification, defendant produced a driver's license with the name Pridemore. Officer Collvins noticed that the license had no photograph and that the descriptive information on it did not match defendant's appearance. The officer again asked defendant if the Pontiac belonged to him. Realizing that the police would eventually find out the truth, defendant admitted that the car belonged to him and that he had been driving it. The officer then placed defendant under arrest for an investigation pursuant to Texas law.

Officer Collvins frisked defendant and found a twenty-two caliber pistol concealed in defendant's waistband. Defendant was then taken to the police station. A later search of the Pontiac revealed a twenty-two caliber Omega pistol.

Defendant later agreed to provide a statement to the police. Defendant was advised of his right to remain silent and his right to an attorney. He was informed that if he could not afford an attorney, one would be appointed for him. Defendant was also advised that any statement he made would be used in court. During his statement, defendant confessed to killing a cab driver in Indianapolis in late November of the previous year. Defendant read and signed his statement after it was typed.

Defendant was later placed in the custody of law enforcement authorities in Laclede County, Missouri, for his admitted involvement in a murder there. Defendant informed Missouri authorities that he had used a twenty-two caliber Omega pistol to kill a cab driver in Indianapolis.

The Laclede County authorities notified the Marion County Sheriff's Department. Detective Robert Edwards traveled from Indianapolis to Missouri on February 5, 1965, to take a statement from Defendant. After being advised of his rights and acknowledging that he understood them, defendant described how he had murdered Louis Briggs. Briggs had been discovered slumped in the driver's seat of a taxi in Indianapolis on November 27, 1964, with four gunshot wounds to the head. Defendant stated that he intended to shoot Briggs and that he took approximately thirteen dollars from Briggs before he shot him in the head.

The police secured a warrant on February 4, 1965, for defendant's arrest for the murder of Briggs, and another warrant on February 5, 1965, for the murder of another Indianapolis resident, Ambrose Best. These warrants were sent by the Marion County Sheriff to Missouri officials on February 11, 1965, accompanied by a letter which said, in part, "We wish to have these warrants to serve as detainers, until such time Crawford is released to us for trial."

No further action appears of record until 1973, when the State lodged a detainer against defendant for the murder of Best pursuant to the Interstate Agreement on Detainers (I.A.D.).[1] By this time, defendant

---

1. The Interstate Agreement on Detainers as adopted in Indiana in relevant part provides: (a) Whenever a person has entered upon a term of imprisonment in a penal or correctional institution of a party state and whenever during the continuance of the term of imprisonment there is pending in any other party state any untried indictment, information or complaint on the basis of which a detainer has been lodged against the prisoner, he shall be brought to trial within one hundred eighty (180) days after he shall have caused to be delivered to the prosecuting officer and the appropriate court of the prosecuting officer's jurisdiction written notice of the place of his imprisonment and his request for a final disposition to be made of the indictment, information or complaint; provided that for good cause shown in open court, the prisoner or his counsel being present, the court having jurisdiction of the matter may grant any necessary or reasonable continuance.
. . . .

was serving a life sentence in the Missouri State Penitentiary. Shortly thereafter, defendant requested final disposition of the Ambrose Best murder charge by filing his I.A.D. Inmate's Notice of Place of Imprisonment.

On June 1, 1990, the Marion County prosecutor commenced the present action, for the murder of Louis Briggs, by filing an information charging defendant with First Degree Murder. On June 4, 1990, the Marion County Sheriff's Department wrote to the Missouri State Penitentiary advising Missouri authorities of a murder charge against defendant that was unrelated to the murder charge that had been lodged against defendant in 1973. On June 15, 1990, the State of Indiana lodged a detainer against defendant pursuant to the I.A.D. regarding the Louis Briggs murder.

On January 5, 1992, defendant filed a motion to dismiss the immediate charge. On May 24, 1993, defendant, while still incarcerated in Missouri, requested final disposition of his case by filing his I.A.D. Inmate's Notice of Placement of Imprisonment. On August 18, 1993, an initial hearing was held and trial was scheduled for November 15, 1993. On October 29, 1993, the State filed its motion in opposition to defendant's motion to dismiss. The motion to dismiss was denied following a hearing on November 5, 1993.

On November 9, 1993, defendant moved for a continuance. The trial was rescheduled for January 3, 1994. On November 19, 1993, the State moved for a continuance, and the trial was rescheduled for February 14, 1994. Defendant waived his right to a jury trial and his bench trial commenced on February 14, 1994. Defendant was convicted of First Degree Murder [2] and sentenced to life imprisonment on March 11, 1994.

*Discussion*

I

A

■ Defendant contends that the trial court erroneously denied his motion to dismiss because his rights to a speedy trial as guaranteed by the Sixth Amendment to the United States Constitution and made applicable to the states by the Fourteenth Amendment and by Article 1, § 12, of the Indiana Constitution were violated by the State of Indiana's failure to bring him to trial until almost thirty years after the murder charged occurred. The right to a speedy trial is fundamental to our system of justice and is guaranteed to an accused facing criminal charges in Indiana courts by the Sixth Amendment through the Fourteenth Amendment and by the Indiana Constitution. U.S. Const. amend. VI; U.S. Const. amend XIV, § 1; Ind. Const. art I, § 12.[3] Indiana applies the federal speedy trial analysis to claims made under our state constitution. *Fortson v. State*, 269 Ind. 161, 168, 379 N.E.2d 147, 152 (1978).

■ It has long been the law that a defendant's speedy trial rights do not attach until the filing of a formal indictment or information or until actual restraints are imposed by an arrest and holding to answer a criminal charge. *Burress v. State*, 173 Ind. App. 286, 288, 363 N.E.2d 1036, 1038 (1977) (quoting *United States v. Marion*, 404 U.S. 307, 321, n. 13, 92 S.Ct. 455, 464, n. 13, 30 L.Ed.2d 468). Because a prosecution for murder may be commenced at any time in Indiana, Ind.Code § 35–42–4–2(b), the fact that the State filed the information at issue twenty-five years after the Louis Briggs murder does not necessarily mean that de-

---

(d) Any request for final disposition made by a prisoner pursuant to paragraph (a) hereof shall operate as a request for final disposition of all untried indictments, information or complaints on the basis of which detainers have been lodged against the prisoner from the state to whose prosecuting official the request for final disposition is specifically directed.
Ind.Code § 35–33–10–4 (1993).

2. Ind.Code Ann. § 10–3401 (Burns 1941). Defendant was also convicted of felony murder for

the same offense. The trial court merged this conviction with the first degree murder conviction.

3. Defendant makes no claim based on Indiana Criminal Rule 4. *See* Ind.Crim.Rule 4. Speedy trial guarantees exist even in situations not covered by Indiana Criminal Rule 4 and apply to an accused who may be incarcerated in another state for a different crime. *Cooley v. State*, 172 Ind.App. 199, 203, 360 N.E.2d 29, 32 (1977).

fendant's speedy trial rights were violated. Defendant's speedy trial rights attached on June 1, 1990, when the State of Indiana filed the information that charged him with First Degree Murder and he became an accused for purposes of speedy trial analysis. *Burress*, 173 Ind.App. at 288, 363 N.E.2d 1036. Accordingly, the time period we will consider in determining whether there was a violation of defendant's speedy trial rights is that period from June 1, 1990, to the date of his trial on February 14, 1994.

When a defendant's speedy trial rights have been implicated, we undertake a balancing test mandated by *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), in which the conduct of both the State and the defendant are weighed. We consider such factors as the length of the delay, reasons for the delay, the defendant's assertion of his right, and prejudice to the defendant. *Id.*, 407 U.S. at 530, 92 S.Ct. at 2192; *Fortson v. State*, 269 Ind. at 168, 379 N.E.2d at 152. Citing *Ballentine v. State*, 480 N.E.2d 957 (Ind.1985) (two and one-half year delay between State's awareness that the defendant was being held in custody in another state and the forwarding of detainers for defendant), the State concedes that the three year, seven month and fourteen day period between defendant's accusation and his trial was sufficient delay to trigger the application of the *Barker v. Wingo* analysis. We agree and therefore inquire into the reasons for the delay.

Three days after the State filed the information, it wrote to the Missouri authorities and requested to be notified when defendant was released from incarceration in that state. Approximately two weeks later, the State lodged a detainer pursuant to the I.A.D. against defendant for the Louis Briggs murder. It was then incumbent upon defendant to serve the State with a written notice requesting final disposition of the charge. Ind.Code § 35–33–10–4 (1993). Defendant took no measures to have such a request delivered to the State until May 24, 1993. Thus, during the time period from June 15, 1990, to May 24, 1993, defendant waived any right to assert delay in the disposition of his case by electing not to invoke

his rights under the Interstate Agreement on Detainers. *See* Ind.Code § 35–33–10–4 (1993). Further, the record reveals that within two and one-half months of the State's receipt of defendant's request for final disposition of his case, the State notified defendant of his trial date, which date was rescheduled twice because of continuance requests by both defendant and the State. Thus, from May 24, 1993 to defendant's trial on February 14, 1994, the reasons for delay in trying defendant are attributable to the "ordinary procedures for criminal prosecutions," which procedures are "designed to move at a deliberate pace." *United States v. Ewell*, 383 U.S. 116, 120, 86 S.Ct. 773, 776, 15 L.Ed.2d 627 (1966). Because the reasons for the delay in trying defendant were either directly attributable to defendant's own inaction or to the ordinary and deliberate procedures for criminal prosecutions, we weigh the reasons for delay in favor of the State.

We next consider defendant's assertion of his right to a speedy trial and find that he unequivocally did so by filing in the trial court a motion to dismiss in which he alleged that his rights to a speedy trial under the Sixth and Fourteenth Amendments to the United States Constitution had been violated. Accordingly, this factor weighs in defendant's favor.

Finally, we examine any prejudice to defendant that was caused by the alleged delay in trying him. We make this examination mindful of the interests the speedy trial right was designed to protect: prevention of oppressive pretrial incarceration; minimization of anxiety and concern of the accused; and limiting the possibility that the defense will be impaired. *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193. "Of these, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system. If witnesses die or disappear during a delay, the prejudice is obvious." *Id.* Here, prevention of pretrial incarceration is not a consideration as defendant was serving a life sentence in Missouri prior to trial. Further, there is no claim that the pretrial delay caused defendant to be anxious or concerned. Thus, the focus of our inquiry is how any

alleged delay impaired the defense of this case.

Defendant asserts that delay impaired his defense for two reasons. First, he could not present his alibi witness, his mother, because she had died by the time of trial. Second, the time and space between the events and their presentation to the court as fact was presumptively prejudicial. We cannot say that defendant was not prejudiced by the death of his alibi witness. Moreover, we acknowledge the fact that over time witnesses' memories fade and that such loss of memory may not be "reflected in the record because what has been forgotten can rarely be shown." *Barker v. Wingo*, 407 U.S. at 532, 92 S.Ct. at 2193. We think, however, that any prejudice that defendant suffered was overcome by the State's presentation of evidence demonstrating that defendant made detailed statements to three different law enforcement agencies in which he confessed to killing Louis Briggs, described the date, time, location of the murder, and the number and location of the wounds on the victim's body. The State also demonstrated that when defendant was arrested, he was in possession of the type of gun that was used to kill the victim.

When we balance the four *Barker v. Wingo* factors, we conclude that defendant was not denied his constitutional rights to a speedy trial.

## B

▮▮▮ Defendant similarly contends that his right to due process under the Fourteenth Amendment to the United States Constitution was violated due to the delay between the date of the crime and his trial. Even where, as here, there is no statute of limitations operating as the primary guarantee that stale criminal charges will not be filed, the particulars of a case may reveal that undue delay and resultant prejudice constitute a violation of due process. *Patterson v. State*, 495 N.E.2d 714, 718 (Ind.1986). "However, the mere passage of time is not presumed to be prejudicial, and it is the defendant's burden to prove that undue prejudice arises from the delay." *Id.* Defendant makes the same assertions of prejudice here

as he did under his speedy trial claim—that his alibi witness died during the delay and that the thirty year time period between the crime and his trial was presumptively prejudicial. Defendant has not convinced us that undue prejudice arose from the delay at issue. First, this court has already upheld the constitutionality of statutes, similar to the murder statute at issue here, that do not recognize any limitation on the time for prosecution. *See Kelley v. State*, 204 Ind. 612, 623, 185 N.E. 453, 457 (1933). Second, the three confessions that defendant made to three different law enforcement agencies more than overcame any prejudice that may have resulted from the alleged delay. *See Jefferson v. State*, 399 N.E.2d 816, 820 (Ind. Ct.App.1980). Third, defendant has not shown that the delay in his prosecution was a deliberate attempt by the State to gain unfair advantage. *Patterson*, 495 N.E.2d at 719. Defendant was not denied due process when he was tried nearly thirty years after the murder.

## C

Defendant contends that his case should have been dismissed because the State did not bring him to trial within the 180 day period following his filing of a notice of place of imprisonment and request for final disposition, as required by the I.A.D. *See* Ind. Code § 35–33–10–4–3, art. 3(d), *supra* note 1.

## C–1

As noted above, the State lodged a detainer against defendant in 1973. This detainer related only to the murder of Ambrose Best, not Louis Briggs. Defendant responded with a notice of place of imprisonment and request for final disposition sufficient to trigger the I.A.D. requirement that he be brought to trial within 180 days for the murder of *Ambrose Best*. However, defendant also claims that this notice and request was sufficient to trigger the 180 day requirement with respect to the Louis Briggs murder as well.

Also as noted above, in 1965, the Marion County sheriff served *warrants* on defendant in jail in Missouri for each of the murders of Best and Briggs. The sheriff wrote the Mis-

souri authorities, "We wish to have these warrants to serve as Detainers until such time as Crawford is released to us for trial." These warrants were sent with defendant and received by the warden when he was incarcerated in the Missouri State Penitentiary later that year. Defendant argues that these warrants were detainers within the meaning of the I.A.D. If so, when he responded to the 1973 detainer with "a request for final disposition of *all* untried indictments, informations or complaints on the basis of which detainers have been lodged against me from" Indiana, his request would have related not only to the Ambrose Best detainer filed in 1973 but also to the two warrants filed in 1965. If he is right, he would be entitled to dismissal on the Louis Briggs charges.

▬ A prisoner's request for final disposition only triggers the I.A.D. requirement that he be brought to trial within 180 days if it is made in response to a detainer lodged against the prisoner on the basis of an "untried indictment, information or complaint." Ind.Code § 35–33–10–4, art. 3(a) and (d). Thus the fact that the Marion County Sheriff intended the 1965 warrant concerning the Briggs murder to serve as a detainer did not make the warrant a detainer unless it was based upon an untried indictment, information or complaint.

▬ With respect to whether the 1965 warrant was based upon an untried indictment or information, the trial court found:

2. In 1965, a trial for murder in Marion County, Indiana, could only occur as a result of a grand jury indictment. A defendant, however, could be held to answer by complaint and warrant while the grand jury was making its probable cause determination.

· · · · ·

5. No evidence is in the record that the grand jury of Marion County ever re-

turned an indictment for the murder of Louis Briggs against defendant or that the Marion County prosecutor filed an information upon which probable cause was found to charge defendant with the murder of Louis Briggs until this court on June 1, 1990, found probable cause and issued the arrest warrant which is the basis of the present prosecution.

Defendant does not contest these findings on appeal and so we conclude that the 1965 warrant was not based on an untried indictment or information with respect to the Briggs murder.

The question remains, however, whether the 1965 warrant might either constitute or be based upon a "complaint" within the meaning of the I.A.D. Though an issue of first impression for our state, this issue has been confronted by other courts, a number of which have held that the lodging of a mere arrest warrant does not trigger application of the I.A.D. because warrants, obviously not indictments or informations, are also not "complaints" for I.A.D. purposes. For example, the Ninth Circuit has held:

Appellant contends that the word "complaints," as used in the Act, should be interpreted in its lay, rather than its legal, technical sense. But its use as the final of a series of three technical terms, all related in meaning, precludes accepting his argument. The principles of *ejusdem generis* and common sense dictate that "complaints" be read as a legal word of art, according to the Fed. Rule Crim p. 3 definition.[4] The use of "untried" as the qualifier for all three words supports this conclusion. Similarly, IADA's reference to the "dismissal with prejudice" of indictments, informations, and complaints, supports this conclusion. 18 U.S.C.App. § 2, art. III(d).

*United States v. Bottoms,* 755 F.2d 1349, 1350 (9th Cir.1985); *Accord United States v. Hall,* 974 F.2d 1201, 1203 (9th Cir.1992).[5]

---

4. Federal Rule of Criminal Procedure 3 provides:

The complaint is a written statement of the essential facts constituting the offense charged. It shall be made upon oath before a magistrate. Fed.R.Crim.P. 3.

5. The I.A.D. qualifies as an interstate compact under the Compact Clause (U.S. Const. art. 1, § 10, cl.3) and therefore is a federal law subject to federal construction. *Cuyler v. Adams,* 449 U.S. 433, 438, 101 S.Ct. 703, 706, 66 L.Ed.2d 641 (1981).

Similarly, the Virginia Supreme Court has held:

> Appellant construes Article III of [the I.A.D.] to require his case to be disposed of within 180 days following July 7, 1986 because, he says, the word "complaint" includes warrants of arrest such as the document upon which the detainer request was lodged. We disagree. There are jurisdictions in which documents entitled complaints are instruments upon which detainees could be immediately tried upon their return to the receiving state; however, in Virginia a complaint, as that word is defined in Rule 3A:3 of the Virginia Rules of Criminal Practice and Procedure, is not a document upon which a defendant may be tried.

*Locklear v. Commonwealth,* 7 Va.App. 659, 376 S.E.2d 793, 795 (1989). The Montana Supreme Court has reached the same result:

> The second issue presented by petitioner is determined by the Ninth Circuit Court of Appeals decision of the *United States v. Bottoms* (1985), 755 F.2d 1349. In *Bottoms,* the court determined that an arrest warrant for escape of the defendant in the receiving state was not sufficient to fall under the definition of an "indictment," "information," or "complaint" thereby triggering the I.A.D. in the custody state. This ruling was based upon the language of 18 U.S.C.App. § 2, art. 1 of the Interstate Agreement on Detainers Act which is the precise language of the Montana Interstate Agreement on Detainers. Section 46–31–101, et seq. MCA.

*Blakey v. District Court,* 232 Mont. 178, 755 P.2d 1380, 1384 (1988). This is also the position of the Florida Court of Appeals:

> An arrest warrant is not an "untried indictment, information or complaint" so as to trigger compliance with section 941.45, Florida Statutes (1989), the Interstate Agreement on Detainers statute.

*Taylor v. State,* 582 So.2d 152 (Fla.Ct.App. 1991). *Contra, State v. Moore,* 774 S.W.2d 590, 597 (Tenn.1989); *State v. Smith,* 73 Md. App. 378, 534 A.2d 371 (1987).

While we acknowledge the contrary authority just cited, we find the reasoning in *Bottoms* and its progeny persuasive. First, we think that the most logical reading of the "indictment, information or complaint" list of terms is that each plays an equivalent role in criminal procedure; a complaint must be more than just the affidavit upon which an arrest warrant is based. Second, we find this conclusion comports with the general trend of federal courts to give the term "detainer" a narrow scope.[6]

We conclude that defendant's 1973 request for final disposition did not trigger the I.A.D. requirement that he be brought to trial within 180 days for the murder of Louis Briggs.

### C-2

█ The record does not indicate when defendant's Inmate's Notice of Place of Imprisonment of May 24, 1993, was actually delivered to the prosecuting attorney and the appropriate court having jurisdiction. However, the trial court noted in its ruling on defendant's motion to dismiss that the I.A.D. period commenced on June 3, 1993.

█ The first trial date was scheduled for November 15, 1993. Therefore, even if the I.A.D. period began to run on May 24, 1993, the day defendant prepared his request for

---

**6.** Three cases illustrate this trend.

After several courts held that a writ of habeas corpus *ad prosequendum* was a detainer entitling a state inmate to protections of the I.A.D. when taken into federal custody by a writ and returned to the inmate's state institution before trial (on the theory that the prosecution could circumvent the I.A.D. procedures by using such a writ), the United States Supreme Court held that a writ of habeas corpus *ad prosequendum* does not constitute a detainer. *United States v. Mauro,* 436 U.S. 340, 359–61, 98 S.Ct. 1834, 1846–48, 56 L.Ed.2d 329 (1978).

After noting that the purpose of the I.A.D. is "to minimize the adverse impact of a foreign prosecution on rehabilitative programs of the confining jurisdiction," the Seventh Circuit has held that a detainee awaiting trial in a local jail does not have a sufficient interest in the confining institution's rehabilitative programs to justify invocation of the I.A.D. *United States v. Castor,* 937 F.2d 293, 296 (7th Cir.1991).

And in *Carchman v. Nash,* 473 U.S. 716, 105 S.Ct. 3401, 87 L.Ed.2d 516 (1985), the United States Supreme Court held that I.A.D. Article III does not apply to detainers based on probation-violation charges.

final disposition, defendant would have been tried within 175 days from the date on his request. However, defendant moved for a continuance of the November 15, 1993, trial date, and his trial was rescheduled for January 3, 1994. There is no indication in the record that defendant objected to his trial date being moved beyond the 180 day I.A.D. period. The State later moved to continue the January trial date, and defendant's trial date was rescheduled for February 14, 1994. The record reveals that defendant did not object to the February trial date, even though this date was well beyond the 180 day I.A.D. period. Although both of the rescheduled trial dates were beyond the 180 I.A.D. period, defendant did not object to being tried on either date. Failure of defendant timely to move to have his case dismissed on grounds that the State violated the 180 day I.A.D. period waives that right. *Scrivener v. State*, 441 N.E.2d 954, 956 (Ind.1982).

## II

■■■ Defendant contends that his conviction should be set aside because he was not properly charged. At the time of the murder, the State was required to bring all murder charges by indictment. *Walker v. State*, 251 Ind. 432, 241 N.E.2d 792 (1968). In 1981, the General Assembly changed this rule, allowing Murder to be charged by information or indictment. Ind.Code § 35–34–1–1 (1993). The State charged defendant by information and claims that it properly did so pursuant to the 1981 rule. Citing *Parsley v. State*, 273 Ind. 46, 401 N.E.2d 1360 (1980), defendant claims that he should have been charged by indictment because that was the rule in effect at the time he committed the crime.

■■■ *Parsley* is not applicable to the present case because it involved a situation where the defendant attempted to invoke the retroactive application of a law to his case so that he could be sentenced under a different sentencing regime than the one in effect when he committed the crime. *Id.* 401 N.E.2d at 1361. Here, defendant seeks the opposite, claiming that a procedural rule of law in effect at the time of the crime must be applied to his case. Thus, *Parsley* is not

controlling here. Further, the State would be precluded from applying the 1981 rule to defendant if the rule were an *ex post facto* law. U.S. Const. art. 1, § 10, cl.1; Ind. Const. art. 1, § 24. That is, the 1981 rule would be unconstitutional as applied here if it was a law that substantially disadvantaged defendant because it increased his punishment, changed the elements of or ultimate facts necessary to prove the offense, or deprived defendant of some defense or lesser punishment that was available at the time of the crime. *See Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 963–64, 67 L.Ed.2d 17 (1981); *Warner v. State*, 265 Ind. 262, 267, 354 N.E.2d 178, 182 (1976); *Iseton v. State*, 472 N.E.2d 643, 650 (Ind.Ct.App.1984). However, the 1981 rule is procedural and involves the methods the State may use to bring a murder charge. It does not increase defendant's punishment, change the elements of or the facts necessary to prove the offense, or deprive defendant of some defense or some lesser punishment that was available at the time of the crime. The state was not required to charge defendant using the *pre*–1981 rule because the *post*–1981 rule was not an *ex post facto* law and therefore its application here was not improper. *See Vanslyke v. Shryer*, 98 Ind. 126, 132 (1884).

## III

Defendant contends that the trial court erroneously denied his motion to suppress all the evidence arising out of his initial stop in Texarkana, Texas, because Officer Collvins had insufficient probable cause for the stop. The State responds that the stop at issue was a perfectly valid *Terry* stop. *See Terry v. Ohio*, 392 U.S. 1, 28, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968) (holding that police stops of limited duration that are reasonably related in scope to the justification for their initiation are legal). However, *Terry* was decided three years after the stop at issue. Arguably, under the law in effect prior to *Terry*, probable cause, not reasonable suspicion, was required to stop defendant. *See Florida v. Royer*, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion of White, J.) ("Prior to *Terry* . . . any restraint on the person amounting to a sei-

zure for the purposes of the Fourth Amendment was invalid unless justified by probable cause.").

■ This precise issue, involving these precise facts, was addressed by the Supreme Court of Missouri during defendant's appeal from his murder conviction in that state. In its 1967 opinion decided under the law in effect prior to *Terry*, the Supreme Court of Missouri observed:

> [B]efore his arrest in Texarkana one of the local police officers observed a Pontiac.... It was a late model car, the rear glass was broken out, and it bore an Indiana's dealer's license, wired on. While standing outside the car the officers ... could and did see blood all over the inside and on items of clothing and baggage on the backseat, as well as on the outside of the right front door .... the officers later drove into the alley behind the police station as defendant walked through the alley in the direction of the parked car. Defendant was wearing clothing normally worn by persons from the climate locale of the state license plate borne by the car. Defendant hesitated when he saw the police car. Driving up alongside defendant, one of the officers got out and asked him who he was and for identification. Defendant handed the officer an Illinois driver's license and the officer asked him if that was his Pontiac around the corner with the Indiana license; defendant said: "It is not." The officer obviously did not believe that answer, for, as he returned the driver's license to defendant, he asked: "You mean to tell me that's not your car?" To this, defendant replied, "Yes, it is my car." His suspicions being further aroused by these inconsistent answers, the officer told defendant he was under arrest, and, searching him for weapons, found a .22 caliber pistol in his belt....
>
> Under these circumstances the police officers had reasonable cause to believe that the Pontiac was a stolen automobile, and that defendant had stolen and had driven it across state lines; therefore, his arrest without a warrant was lawful, and the subsequent search and seizure incident to the arrest did not violate constitutional guaranties against unreasonable search and seizure.

*State v. Crawford,* 416 S.W.2d 178, 185–86 (Mo.1967). We agree with the analysis of the Supreme Court of Missouri on this issue.

## IV

Although Detective Steven Gibbs, who was assigned to defendant's case, testified at the hearing on defendant's motion to dismiss, the State chose not to call Det. Gibbs as a witness for the State during trial. However, the defense decided to call Det. Gibbs to testify and requested permission to review any documents Det. Gibbs would be reviewing prior to being called to testify. The prosecuting attorney stated that she had no objection to the defense examining Det. Gibbs's file and that she believed that everything in that file had already been the product of discovery. After a brief recess, during which defense counsel reviewed the file, counsel stated that there was one item in the file that had not been provided during discovery.

The document was an interdepartmental memorandum dated March, 1990, in which Det. Gibbs had summarized his investigation of this case up to that point. The prosecution stated that the document had not been provided with the other discovery materials because the prosecution had never had custody of it. The trial court ruled that the document was not discoverable because Det. Gibbs was not a witness for the State. The defense then asked the trial court to review the document because the defense believed that the document would have some impact on the trial court's earlier decision to deny the motion to dismiss in which defendant claimed that his speedy trial rights had been violated. The trial court refused to review the document stating that it did not believe that the document was relevant to the speedy trial issue because the document was written prior to formal charges being filed and speedy trial rights do not attach until there are formal charges. The trial court ordered that the document be sealed and placed it in the record.

Defendant asks this court to review the document to determine its impact on his motion to dismiss. We have done so and

conclude that this document has no relevance to the propriety of the trial court's denial of defendant's motion to dismiss.

### Conclusion

Defendant's conviction and sentence for First Degree Murder is affirmed.

SHEPARD, C.J., and DICKSON and SELBY, JJ., concur.

DeBRULER, J., dissents with separate opinion.

DeBRULER, J., dissenting.

While being held by police in Missouri, appellant confessed that he had murdered Best and Briggs in Indiana in separate events. Judge Zaklan, a judge of the Marion Municipal Court, issued two warrants for the arrest of appellant: one on February 4, 1965 for the murder of Briggs and another on February 5, 1965 for the murder of Best. These warrants were lodged by Marion County Sheriff Fields with Missouri officials with the following letter dated February 11, 1965:

> Attached is a warrant charging Crawford with First Degree Murder on an unidentified victim, until his confession and our later positive identification proved the victim to be Ambrose Victor Best. This places two (2) warrants in your possession charging Crawford with First Degree Murder from Marion County, Indianapolis, Indiana. We wish to have these warrants to serve as Detainers, until such time Crawford is released to us for trial. We are desirous to obtain Crawford back here to stand trial on each of the two charges, and will certainly expedite when and if it is decided Missouri authorities have disposed of their case.

Records of Marion County Sheriff's office disclose that the warrant issued on February 4, 1965, was for the arrest of appellant for killing Briggs:

> February 4 1965, Secured and filed Warrant on subject Charles Lee Crawford in Municipal Court # 6, on the charge of First Deg. Murder. (Victim) Louis E. Briggs W/M/37

In 1973, Marion County indicted appellant for the murder of Best and lodged such indictment as a detainer. On October 17, 1973, appellant filed his notice to the prosecuting attorney of Marion County, Indiana, requesting final disposition of the 1973 indictment, specifically naming it, together with "all untried indictments, informations, or complaints on the basis of which detainers have been lodged against me from your state...." A record dated September 27, 1965, made by the warden of the Missouri State Penitentiary discloses the following:

> Receipt of yours of February 11, 1965 is acknowledged. * * * Your warrants received. This inmate was assigned to this Penitentiary, effective September 27, 1965. He is serving a Life sentence for Murder in the First Degree.

In 1965, Judge Zaklan, as judge of the Marion Municipal Court, had no jurisdiction to try a murder charge. He did, however, have jurisdiction to act as a committing magistrate in felony cases pursuant to two existing statutes:

> When any person has committed a crime in any county ... punishable by ... state's prison, and has fled to any other county, state, territory, or country and ... a grand jury indictment or affidavit charging said person with said crime has been filed, the judge of the circuit, ... city court or justice of the peace before whom the said indictment or affidavit is filed, shall issue a warrant for the arrest of said criminal....

> Any justice of the peace or city judge, ... on complaint made on oath before him, charging any person with the commission of any felony or misdemeanor, shall issue his warrant for the arrest of such person, and cause him to be brought forthwith, before him for examination or trial.

Burns 9–704; Burns 9–701, respectively. In issuing the two warrants for the arrest of appellant, Judge Zaklan acted under the authority of one of these statutes. Under the first, the warrants would have been issued on the basis of an affidavit charging first degree murder. In 1965, "affidavit" was the name for a charging pleading in a criminal case, and was not simply a factual affidavit. Under the second, the warrants would have

been issued upon the basis of a complaint which stated a criminal charge, upon which a trial would be possible. Obviously then, a complaint was also a charging pleading and not simply a factual affidavit.

The jurisdiction exercised by Judge Zaklan is explained in *State ex rel. Imel v. Municipal Court*, 225 Ind. 23, 72 N.E.2d 357 (Ind. 1947). In that case, an affidavit charging Imel with having murdered his stepmother was filed in the Marion Municipal Court, the same court served by Judge Zaklan years later in 1965. This court explained the procedure then operating in the municipal court:

> It seems to us, therefore, and we hold that the Municipal Court of Marion County has the jurisdiction and power to act as a committing magistrate in felony cases and, that being true, the Prosecuting Attorney was within established practice in filing an affidavit for the purpose of holding relator for grand jury action, and when that affidavit was filed, even though relator's guilt could not be finally determined in that court, he stood *charged* with first degree murder and the first step in bringing him to trial would be taken there.

*State ex. rel. Imel v. Municipal Court*, 225 Ind. 23, 29, 72 N.E.2d 357, 359 (Ind.1947). In the present case, the trial court found that there was no direct evidence that an indictment or information for murder was filed against appellant. Nevertheless, ample evidence of its equivalent is present in the act of issuance by Judge Zaklan, the facial language of the warrant itself, and the records of the sheriff. Is there any doubt that if appellant had been arrested on this warrant, he would have been taken before Judge Zaklan, who would then have examined the evidence of his alleged participation in the murder of Briggs and would have either discharged him or bound him over in custody for grand jury action? I think not. The warrant from Judge Zaklan bespeaks a charge of murder.

Furthermore, as noted in the majority opinion, a charge of murder in Indiana could only be brought by grand jury indictment in 1965. If the majority is correct that a pleading upon which a trial is possible is required to constitute a detainer under the Agree-ment, however, then no warrant issued by a committing magistrate for arrest upon an actual affidavit or information charging murder could ever have constituted a valid detainer, because there would have been no charging instrument in existence upon which a trial could have been conducted. Clearly, the majority cannot be correct on this point. Such a requirement would simply afford the prosecution the means of avoiding the burdens of the Agreement, while enjoying the benefits of detainers.

The 1965 warrant for the arrest of appellant for the murder of Briggs was issued by Judge Zaklan and if appellant had appeared before Judge Zaklan under arrest pursuant to such warrant, it would have constituted "the first step in the process of bringing him to trial" upon such charge. This is not a warrant standing alone and without a supporting charge. Moreover, the warrant was received by Missouri authorities, was intended by Indiana authorities to be a detainer, operated as a detainer, and continued to do so after the 1973 indictment of appellant for the murder of Best ceased to operate as a detainer, despite the fact that appellant had called for its final disposition in 1973 in his notice to the prosecutor, which identified "all untried ... complaints on the basis of which detainers have been lodged against me from your state." Since the State took no action to finally dispose of that charge within the required 180 days, appellant was entitled to dismissal of that charge and the same charge made later in 1993 in Indiana by indictment, as commanded by the Agreement on Detainers. Ind.Code Ann. 35–33–10–4 (West 1986). Thus, I respectfully dissent.

Finally, peculiarities exist in the federal cases found irresistible by the majority that distinguish them from the present case and preclude any fruitful comparison to it. *United States v. Bottoms*, 755 F.2d 1349 (9th Cir.1985), for instance, involves the question of whether a federal post-escape arrest warrant sent to a state prison constituted a detainer under the Agreement. Bottoms escaped while serving a federal sentence and ended up in state custody. The purpose of the federal warrant was to return Bottoms to federal custody to serve out his sentence.

By contrast, Judge Zaklan's warrant was intended to procure custody of appellant to face a murder charge. *United States v. Hall,* 974 F.2d 1201(9th Cir.1992), involves the question of whether a federal telex informing authorities in custody of Hall that the D.A. had authorized the filing of a complaint, constituted a detainer. There was not even a warrant in that case. Again this is distinguishable from appellant's circumstances. A common thread running through these and similar cases is their failure to accord the first sentence of Article 9 of the Agreement its natural force: This agreement shall be liberally construed so as to effectuate its purposes.