901 P.2d 1221

The STATE of Arizona, Appellee/Cross–Appellant,

v.

Shelly Kay MOTT, Appellant/Cross–Appellee.

No. 2 CA–CR 92–0107.

Court of Appeals of Arizona, Division 2, Department B.

April 28, 1995.

Review Granted Sept. 12, 1995.

Grant Woods, Atty. Gen. by Paul J. McMurdie and Jon G. Anderson, Phoenix, for appellee/cross-appellant.

Susan A. Kettlewell, Pima County Public Defender by Frank P. Leto, Tucson, for appellant/cross-appellee.

## OPINION

ESPINOSA, Presiding Judge.

Defendant Shelly Kay Mott was convicted by a jury of three charges: one count of child

abuse under circumstances *other than those likely* to produce death or serious physical injury, a class four felony; one count of child abuse under circumstances *likely* to produce death or serious physical injury, a class two felony; and one count of first-degree murder, a class one felony. She was sentenced to three terms of imprisonment, the longest being a mandatory term of thirty-five years on the murder count.

On appeal, Mott contends that the trial court committed reversible error by excluding expert testimony that she suffered from "battered woman syndrome," refusing to instruct the jury on the element of "proximate cause" necessary to commit felony murder, admitting evidence of her alleged other bad acts, and advising the venire members that the state was not seeking the death penalty in this case. Mott further argues that her punishment violates both the United States Constitution and state law because it is cruel and unusual and excessive. The state has cross-appealed, contending the trial court erred in instructing the jury on the mental state required for child abuse. Because we are persuaded that the preclusion of Mott's proferred battered woman syndrome evidence constituted a denial of due process, we reverse and remand for a new trial.

### Facts

The tragic circumstances of this case are essentially undisputed. On January 1, 1991, at approximately 9:00 p.m., Mott went to the home of a friend, Erin Scott, leaving her two children with her boyfriend, Vincent Bert Near. Mott returned at approximately 9:50 p.m. and found Near fanning her two-year-old child, Sheena, who was lying in bed. Near told Mott that Sheena had fallen off the toilet and struck her head.

At approximately 10:15 p.m., a mutual friend, Hank Gnatowsky, visited Near and Mott at their home. Near was in the living room reading a first aid book and Mott was sitting with two pamphlets entitled "Your Baby's Safety" and "Your Baby and Crying" next to her. Near told Gnatowsky that Sheena had fallen off the toilet. Gnatowsky looked in on Sheena and observed that her eyes were "fluttering" and her arms were swinging as if she were dreaming. He saw no blood. He spoke to her, but she did not answer. Gnatowsky stayed until approximately 11:30 p.m. During this time, he made three offers to take Sheena to the hospital. Near refused each time, and when Gnatowsky attempted to talk to Mott about it, Near shouted, "I told you twice, 'no.' Do I have to come out and tell you again?" Mott made no response.

The next morning at approximately 8:00 a.m., Mott ran to Scott's house, crying and noticeably upset. She told Scott that something was wrong with Sheena and that she could not wake her. Scott had her bring Sheena over. Sheena's eyes were half open, but she did not respond to Scott's voice. Scott testified that the back of her head felt very soft, bruises were apparent on her face, and she was shaking. Scott called 911.

A paramedic arrived on the scene at approximately 8:30 and began working on Sheena, who was on the couch showing seizure symptoms. Although he testified that he saw small bruises on her body, he did not see blood on the child or the couch during his 12–minute assessment. At the hospital, a CAT scan revealed that Sheena had a large hemorrhage in her brain and that the right side of her brain was dead. She never regained consciousness and died a week later. An autopsy established the cause of death as multiple blows to the head.

Tucson police detective Tim DeJonghe, the investigating officer, obtained three statements from Mott after Sheena was taken to the hospital. He testified that Mott was softspoken, she made little eye contact, and her head was down. She told DeJonghe that when she came home from Scott's, Near told her Sheena had fallen off the toilet and hit the back of her head. Mott said she examined Sheena and found that her eyes were open and her arms were "moving," but she was not responding verbally. She stated that she and Near stayed up all night checking on Sheena and that they tried to wake her twice. Mott claimed that Sheena's arms stopped "moving" and that she went to sleep. But she also indicated that Sheena continued to move her arms through the night, on ten or more occasions.

Mott admitted that she had talked with Gnatowsky and Near about taking Sheena to the hospital. She claimed, however, that Gnatowsky had told her Sheena would be all right and that Near had said they should wait to see if Sheena "comes out of it." At one point, Mott said she did not take Sheena to the hospital in part because she was worried about "the bruises on her body." She also said that Near had told her he would "take the blame." Finally, Mott claimed that it was her idea to take Sheena to the hospital when she could not wake her the next morning.

DeJonghe also questioned Mott about Near's behavior toward Sheena. Mott told him that Near had begun abusing Sheena in May 1990 when they moved to Tucson. Although Mott said she had only seen Near hit Sheena on the bottom, she admitted seeing bruises and slap marks on her body, dressing her to hide the bruises from others, and asking Near about the marks on five or six occasions. Mott also indicated that she did not always believe the explanations Near gave her and that she had been trying to leave Near because he had a tendency to be violent and because she did not want to see Sheena hurt. When asked why she did not report Near, Mott stated that she did not know who to tell and that she did not want Near to be taken away. At the conclusion of the interviews, DeJonghe arrested Mott and Near for child abuse.

## Admissibility of Battered Woman Syndrome

Prior to trial, Mott notified the state of her intent to raise the battered woman syndrome, disclosing Dr. Cheryl Karp as the expert who would testify about it. The state responded with a motion to preclude, arguing that evidence of the syndrome was not admissible in this case because it only applied to situations involving self-defense and the victim here was not the one who had threatened harm to Mott. Mott conceded that she could not raise the syndrome as a defense, but claimed that Karp's testimony about Mott's history of abuse was admissible "to

rebut the State's evidence concerning [her] state of mind." We have found no Arizona case addressing the admissibility of evidence regarding the battered woman syndrome, however, we note that it has been recognized in numerous other jurisdictions,[1] and is included in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders IV.

The trial court initially denied the state's motion to preclude, ordering:

Dr. Karp shall be permitted to testify concerning her opinions of Ms. Mott's mental and emotional make-up and capabilities, provided that a proper foundation is laid that such evidence is admissible under evidence Rules 702 and 703 and the current case law interpreting those matters which rules in criminal cases.

At trial, however, the court did not allow defense counsel to discuss Mott's history of abuse in opening statement. Subsequently, the court precluded Karp from testifying about the battered woman syndrome and its impact on a woman's ability to make decisions and to protect her children. Mott made an offer of proof that Karp, a licensed certified clinical psychologist who specializes in child abuse, family violence, and sexual abuse, would have testified that she had reviewed the police reports and had interviewed Mott and reviewed tests she had taken and that, in her opinion, Mott possessed the characteristics of a battered woman. These characteristics include "learned helplessness" or the passive acceptance of abuse, development of a "traumatic bond" that impedes the woman's ability to stand up to the batterer, fear of male authority figures, lying to protect the batterer, and inability to accurately perceive danger and to protect herself and others from it.

■ The state's threshold claim that Mott waived the issue by "withdrawing the defense" and for lack of a timely and sufficient offer of proof is without merit. Mott's counsel made it clear both before and during trial that Karp would describe Mott's battered woman characteristics resulting from the his-

---

1. *See Bechtel v. State,* 840 P.2d 1 (Okla.1992), listing 31 states and the District of Columbia as accepting or recognizing the scientific validity of battered woman syndrome.

tory provided by Mott of being physically battered and sexually abused. Moreover, on more than one occasion Mott's counsel requested the trial court to allow a specific proffer from Karp, which the court repeatedly denied until the combined motion for new trial/mitigation hearing following Mott's convictions.

■ The state contends that Karp's battered woman testimony was inadmissible in light of the offer of proof which, it maintains, "show[s] that [Mott] wanted Dr. Karp to give an opinion on her mental state at the time of the crime." Absent an insanity defense, Arizona does not allow an expert's opinion on a defendant's state of mind at the time of the offense. *State v. Ortiz*, 158 Ariz. 528, 764 P.2d 13 (1988). While we agree that Karp's proffered testimony included her opinion about Mott's state of mind at the time of the crime, we note that this opinion was elicited by the state and the trial judge at the posttrial hearing, and not by defense counsel. When this issue arose at trial, Mott's counsel assured the court that he would not elicit Karp's opinion about Mott's state of mind at the time of the offense. We will not presuppose that counsel would have acted in derogation of his word.

Alternatively, the state argues that Karp's testimony was inadmissible "because it was not relevant to any recognized defense." The state contends that Mott is essentially raising the defense of diminished capacity, a defense not permitted in Arizona. *State v. Ramos*, 133 Ariz. 4, 648 P.2d 119 (1982). We disagree.

In *State v. Christensen*, 129 Ariz. 32, 628 P.2d 580 (1981), our supreme court addressed the issue of whether evidence which would have established certain character traits of the defendant raised a "diminished responsibility" defense. There, the defendant was convicted of first-degree murder for strangling his wife. Because he did not raise an insanity defense, the trial court precluded him from calling a psychiatrist to establish that he had character traits of difficulty dealing with stress and acting impulsively in stressful situations. In reversing his conviction, our supreme court held:

> The establishment of the character trait of acting without reflection tends to establish that appellant acted impulsively. From such a fact, the jury could have concluded that he did not premeditate the homicide. We therefore hold that the court committed error in excluding the psychiatrist's testimony.

*Id.* at 35, 628 P.2d at 583.

While the supreme court ruled that the psychiatrist in *Christensen* was properly precluded from expressing an opinion as to whether the defendant had acted impulsively at the time of the killing, it found that precluding this character trait evidence altogether was "inconsistent with fundamental justice" because it "prevent[ed] a defendant from offering evidence to dispute the charge against him." *Id.* at 36, 628 P.2d at 584. *See also State v. Gonzales*, 140 Ariz. 349, 681 P.2d 1368 (1984) (exclusion of expert testimony on defendant's low intelligence, mild retardation, and probable organic brain syndrome constituted denial of due process). In another case, this court explained that character evidence of this type does not raise a diminished capacity defense because, if believed, it does not relieve the defendant of responsibility for his or her actions but, rather, negates the mental element of the offense charged, thereby reducing the crime to a lesser offense. *See State v. Druke*, 143 Ariz. 314, 693 P.2d 969 (App.1985).

■ We agree with Mott that Karp's testimony on the character traits of battered women and the presence of those traits in Mott is relevant and admissible to the charged offenses because it provides evidence probative of Mott's behavior and, if accepted by the jury, would negate much of the evidence the state relied upon to show that Mott acted knowingly or intentionally.[2] Mott was charged under A.R.S. § 13–3623(B)(1), which provided at the time of the offense:

---

2. Of course, the underlying factual basis for the expert's opinion is subject to cross-examination under Ariz.R.Evid. 705, 17A A.R.S.

Under circumstances likely to produce death or serious physical injury, any person who causes a child to suffer physical injury or, having the care or custody of such child causes or permits the person or health of such child to be injured or causes or permits such child to be placed in a situation where its person or health is endangered is guilty of an offense as follows:

1. If done intentionally or knowingly[3]
. . . .

To support this charge, the state relied upon the following evidence: Mott's refusal to leave Near despite having the opportunity to do so; her inconsistent statements to the police and other witnesses about what had happened; her passive demeanor and unemotional response to the situation; her inaction and silence; her knowledge of Sheena's bruises and attempts to hide them; her alleged mistreatment of the child prior to coming to Tucson; and Mott's alleged ability to stand up to Near. The jury presumably believed that some of this evidence supported the state's theory because it found Mott guilty of intentional or knowing child abuse.

In contrast, the defense wanted to show that Mott could not have formed the requisite mental state of "intentionally or knowingly" because she had established a "traumatic bond" with Near that impeded her ability to accurately assess both the risk to Sheena in leaving her with Near, and upon Mott's return, Sheena's condition or her need for immediate medical care. Because of this "traumatic bond," Mott accepted Near's explanations and his assurances that Sheena was "OK," was unable to defy Near when he told her not to take Sheena to the hospital, and was willing to lie to protect Near when police and others asked what had happened. The defense also intended to explain, through Karp's testimony, that because of Mott's history of abuse, she had developed what is known as "learned helplessness" or the passive acceptance of abuse. Karp stated that flat affect, unresponsiveness and inaction are common aspects of this trait.

Exclusion of expert testimony constitutes a denial of due process "[w]here the trial court is shown, in an offer of proof or otherwise, that a defendant's mental condition has probative value to a material issue in dispute. . . ." *Gonzales*, 140 Ariz. at 353, 681 P.2d at 1372. Karp's testimony about Mott's battered woman characteristics tended to negate the state's contention that Mott acted with intent or knowledge when she temporarily left Sheena with Near, and when she failed to promptly take Sheena to the hospital. The trial court, in failing to recognize the relevance of this testimony, effectively denied Mott the opportunity to present evidence essential to her defense. Furthermore, we cannot agree with the state's contention that any error was harmless. Had the excluded testimony been admitted, the jury's conclusion may well have been different. We therefore hold that the trial court committed reversible error in excluding the expert testimony about Mott's battered woman diagnosis and characteristics.

In view of our resolution of this issue and reversal of Mott's convictions, we do not address Mott's additional claims on appeal. As to the state's cross-appeal premised on the trial court's wording of its instruction to the jury on the elements of A.R.S. § 13–3623(B), we have reviewed the statute, the instruction in question, which was taken almost verbatim from the Recommended Arizona Jury Instructions § 36.23 and parallels the language of the statute, as well as the form of verdict and find that the jury was sufficiently apprised of the law.

Mott's convictions and sentences are reversed, and this matter is remanded for a new trial consistent with this decision.

DRUKE, C.J., and HATHAWAY, J., concur.

---

3. " 'Intentionally' or 'with the intent to' means, with respect to a result or to conduct described by a statute defining an offense, that a person's objective is to cause that result or to engage in that conduct." Former A.R.S. § 13–105(6)(a).

" 'Knowingly' means, with respect to conduct or to a circumstance described by a statute defining an offense, that a person is aware or believes that his or her conduct is of that nature or that the circumstance exists." Former A.R.S. § 13–105(6)(b).