**Alice BARRETT, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 55A01–9604–CR–135.**

Court of Appeals of Indiana.

Dec. 31, 1996.

Rehearing Denied March 17, 1997.

Transfer Denied May 22, 1997.

Steven C. Litz, Monrovia, for Appellant–Defendant.

Pamela Carter, Attorney General of Indiana and Lisa M. Paunicka, Deputy Attorney General, Indianapolis, for Appellee–Plaintiff.

## OPINION

BAKER, Judge

In this case of first impression we are asked to determine whether testimony regarding Battered Women's Syndrome is relevant to the issue of a defendant's intent to commit a crime. Appellant-defendant Alice Barrett was convicted of Neglect of a Dependent,[1] a Class B felony, following the death of her four-year-old child at the hands of Barrett's live-in boyfriend. Prior to trial, the trial court granted the State's motion in limine seeking to preclude Barrett from presenting evidence regarding Battered Women's Syndrome. On appeal, Barrett contends that the trial court erred for the following reasons: 1) determining that evidence of Battered Women's Syndrome was irrelevant except in cases involving a claim of self-defense; 2) refusing her tendered instructions on Battered Women's Syndrome and

the definition of "knowing"; 3) denying her request to individually voir dire the jury; and 4) relying on improper aggravators to impose the maximum sentence.

## FACTS [2]

The factual background relevant to this appeal begins many years ago in Barrett's childhood. Barrett's parents, Lorene and Daniel, divorced when Barrett was five years old. Initially, Barrett resided with Lorene; however, when Lorene lost her job, she sent Barrett to California to live with Daniel. Daniel was a heavy drinker who routinely whipped Barrett with a belt, beat her head against a wall and grabbed her by the ears. Record at 2060–62.

When Barrett was fourteen years old, Daniel took her and her brother, Jeff, to the bus station and sent them back to Indiana to reside with Lorene. Soon thereafter, Lorene sent Jeff away. As a result, Barrett left Lorene's home traveled to California. Eventually, Barrett returned to Indiana and took up residence with a family friend.

Thereafter, Barrett began a series of relationships with abusive men. First, Lorene dated Charlie, who drank heavily and abused her. R. at 2065–66. Barrett had one child with Charlie, C.J. Next, Barrett dated Perry, who was a heroin addict and who fathered two of Barrett's children, Heather and Hope. R. at 2066. Next, Barrett began a relationship with Johnnie, who was extremely protective and jealous. R. at 2068–69. Finally, in July 1995, Barrett began dating Steve Sherwood, who drank heavily. According to Barrett, her relationship with Sherwood was stormy in that he would often drink, become loud and angry and attempt to dominate her by following her and forcing her to stay by his side. On several occasions, Barrett attempted to leave Sherwood, only to eventually return to him.

On September 18, 1995, Sherwood telephoned Barrett at work to inform her that he had spanked Hope and had left a hand print

---

1. IND.CODE § 35–46–1–4.

2. Although we are generally required to consider only those facts most favorable to the verdict, we will include the facts as testified to by Barrett because they are relevant to her claim of Battered Women's Syndrome.

on her buttocks. When Barrett returned from work, she did not inspect Hope's buttocks. However, three days later, when Barrett's roommate, Chris McGowan, was in the bathroom with Hope, Chris noticed that Hope's entire bottom was black and blue. Chris informed Barrett, who then confronted Sherwood. Sherwood cried and stated that he did not intend to hit Hope so hard.

Thereafter, on September 22, 1995, Barrett's mother, Lorene, contacted Barrett about babysitting Hope. During their conversation, Barrett informed Lorene of Hope's bruises. As a result, Lorene took Hope to the Fayette County Sheriff's Department to report the injuries. When Officer Jeff Griffin contacted Barrett regarding the bruises, she stated that Sherwood had admitted that he had spanked Hope and left a hand print. Barrett further reported that on another occasion Hope had fallen, hit her head and vomited and that Sherwood had yelled at Hope, grabbed her hair and pushed her face into the vomit.

Early the following morning, Barrett was awakened by Sherwood who was straddling her and holding a knife. When Barrett screamed, Sherwood threatened to kill her and Hope unless she was quiet. Sherwood then ordered Hope, who had been sleeping in Barrett's bed, to the floor and asked her if he had whipped her. When she answered affirmatively, he called her a liar. Subsequently, Sherwood and Barrett engaged in intercourse. Thereafter, Barrett called 911 and reported that Sherwood was in her home and was unwelcome. Connersville Police Officers William Rockwell and Jeffrey Locke responded to the call and removed Sherwood from Barrett's residence.

Later that day, Barrett again spoke with Officer Griffin and told him that she had been sexually abused by Sherwood that morning. Officer Griffin suggested that Barrett seek shelter at a home for battered women. Barrett declined, but took Hope with her to her brother's residence in Mitchell, Indiana. While Barrett was at her brother's house, Sherwood was charged with Battery, two counts of Criminal Confinement, Rape and Residential Entry.

The following week, Barrett and Hope returned to Connersville. Officer Griffin advised Barrett that a warrant had been issued for Sherwood's arrest, but Barrett indicated that she did not know of his whereabouts. On October 8, 1995, however, Barrett and Hope moved with Sherwood to Martinsville, Indiana, and took up residence at the Hilltop Motel. While Sherwood and Barrett worked, Michelle Fox took care of Hope. When Fox first met Hope, she noticed bruises on Hope's face. Fox questioned Barrett, who explained that Hope had been injured while riding in a truck with Sherwood. Specifically, Barrett stated that Sherwood had swerved to avoid hitting a deer and that Hope had fallen to the floor of the truck. When Barrett later explained the same bruises to her co-workers, she added that when the truck stopped, a tool box slid from the back to the front of the truck and fell on Hope. On another occasion, Barrett explained Hope's fat lip by stating that Sherwood was shaving, had cut himself and was attempting to open the bathroom door when it struck Hope in the face.

On October 21, 1995, Barrett reported to work at approximately 6:00 p.m. Shortly after Barrett arrived, she received a telephone call from Sherwood who stated that Hope was hot and had fainted. Barrett spoke to Hope and asked Sherwood to call her later. When Sherwood called back, he stated that Hope was fine. Barrett left work at approximately 1:00 a.m. and returned to the motel to find Hope dead. Barrett screamed at Sherwood: "What have you done?" and ran hysterically from the hotel. R. at 1465. When questioned by the Indiana State Police and the Morgan County Sheriff's Department, Barrett stated that she was afraid of Sherwood, was stupid to have stayed with him and that she had "paid the ultimate price for her mistake." R. at 1328.

Subsequently, Barrett was charged with neglect of a dependent resulting in serious bodily injury, a class B felony. During voir dire, Barrett petitioned the trial court to question the prospective jurors individually regarding an article which had appeared in a local newspaper. The article had reported that Barrett's two other children had been adjudicated children in need of services

(CHINS) and had been removed from her home during the previous year. The trial court denied her request. Additionally, the trial court granted the State's motion in limine seeking to exclude Barrett's evidence of Battered Women's Syndrome as either a defense or as evidence of her intent, character or state of mind. Barrett was tried by a jury on December 21, 1995, and was convicted as charged. On January 19, 1996, the trial court sentenced Barrett to twenty years imprisonment. Barrett now appeals.

## I. Battered Women's Syndrome

■ Barrett contends that the trial court erred by disallowing her expert testimony regarding Battered Women's Syndrome (BWS).[3] Prior to trial, the State filed a motion in limine seeking to preclude Barrett from introducing evidence of BWS. Following argument from the parties, the trial court granted the motion, concluding:

> The Court has researched the law in the State of Indiana and has found no case in which the "Battered Woman's Syndrome" has been recognized as a defense to the crime of Neglect of a Dependent Resulting in Serious Bodily Injury. This theory defense [sic] is inherent within a case in

which the Defendant is charged with an assault upon the victim (perpetrator of the abuse) as a self-defense argument; however, this theory of defense is not available in a case in which the victim of the crime is not the perpetrator of the abuse, but instead the alleged perpetrator of abuse is a third-party....

R. at 306. According to Barrett, evidence of BWS was relevant to show that she did not knowingly or intentionally neglect her child. Additionally, she claims that she was denied her right to present a defense on her own behalf because she was prevented from responding to the prosecutor's question during both opening and closing arguments regarding why she stayed with Sherwood.

In response, the State contends that the trial court correctly excluded evidence of BWS pursuant to Ind.Evidence Rules 401 and 403. In particular, the State argues that BWS is irrelevant in cases which do not involve the issue of self-defense.[4]

■ In Indiana, the general rule is that evidence is relevant if it tends to make the existence of any fact that is of consequence to the determination of the action more prob-

---

**3.** BWS is "a cluster of symptomatic behaviors that women exhibit after they have lived in an environment of trauma and abuse for a period of time." R. at 2366. Symptoms of the syndrome include the following: repression, a denial of the abuse, minimization of the abuse, a tendency to see the world through the abuser's eyes, a bonding with the abuser leading to an inability to terminate the relationship and an intense fear of the abuser. R. at 2367, 2370. Generally, BWS involves a cyclical, three-step process. Initially, the relationship goes through a tension building phase where minor physical abuse occurs and the abuser destroys the victim's concept of self by trying to control her. Next, a traumatic episode occurs which may include verbal abuse, beatings or even rape. Finally, the relationship experiences a honeymoon phase where the abuser makes promises never to abuse again, to be a better person and to be a better provider, resulting in the victim returning to his control. R. at 2371–74.

**4.** The State also contends in its brief that testimony regarding BWS is inadmissible pursuant to Ind.Evidence Rule 702, which provides:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue,

a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

However, the State concedes that in Indiana, as well as numerous other States, BWS is accepted as a valid scientific theory. *See Isaacs v. State,* 659 N.E.2d 1036, 1041 (Ind.1995) (evidence of BWS admissible to refute defendant's claim that he and victim had friendly relationship prior to her death), *cert. denied* — U.S. ——, 117 S.Ct. 205, 136 L.Ed.2d 140 (1996); *Bechtel v. State,* 840 P.2d 1, 7 n. 5 (Okla.Crim.App.1992) (listing thirty-one states and the District of Columbia as accepting or recognizing the scientific validity of BWS). Further, the State does not challenge the qualifications of Barrett's expert to explain the symptoms and characteristics of BWS or the necessity of an expert to explain the theory to the jury. The State's sole argument is that evidence of BWS is inadmissible because it is only probative in cases involving assaults. Appellee's Brief at 8. Because this is essentially a relevance argument, we will discuss it in the context of Evid.R. 401, not Evid.R. 702.

able or less probable than it would be without the evidence. Evid.R. 401; *Hardin v. State,* 611 N.E.2d 123, 127 (Ind.1993) (evidence is relevant if it tends to prove or disprove a material fact or sheds any light on guilt or innocence of accused). Evidence tending to prove a material fact is admissible even if the tendency to provide such proof is slight. *Goodloe v. State,* 442 N.E.2d 346, 347 (Ind.1982). However, otherwise relevant evidence may be inadmissible if the probative value of the evidence is substantially outweighed by the danger of unfair prejudice to the defendant. *Warner v. State,* 579 N.E.2d 1307, 1310 (Ind.1991); Evid.R. 403.

■ In the instant case, Barrett was charged pursuant to I.C. § 35–46–1–1, which defines neglect of a dependent as:

> (a) A person having the care of a dependent, whether assumed voluntarily or because of a legal obligation, who knowingly or intentionally;
>
> > (1) places the dependent in a situation that may endanger his life or health;
> > . . .
>
> commits neglect of a dependent, a Class D felony. However, . . . the offense is a Class B felony if it results in serious bodily injury.

As part of its burden of proof, the State must show that the accused was *subjectively* aware of a high probability that she placed the dependent in a dangerous situation. *Armour v. State,* 479 N.E.2d 1294, 1297 (Ind.1985). Proof of this subjective awareness requires resort to inferential reasoning to ascertain the accused's mental state. *Hill v. State,* 535 N.E.2d 153, 154 (Ind.Ct.App.1989). Therefore, evidence or testimony regarding the accused's mental state is relevant to determine whether the accused knowingly or intentionally placed the dependent in a dangerous situation.

Here, Barrett offered the testimony of Gail Beaton, a social worker, to explain how BWS can affect a person's state of mind and perception of danger to her dependent. This testimony was relevant and necessary to determine Barrett's mental state and, therefore, whether she acted knowingly or intentionally in neglecting her dependent. Thus, the trial court erred in refusing to permit Barrett to present evidence regarding BWS.

Additionally, we reject the State's contention that BWS is only relevant in cases in which self-defense is argued. Indiana courts have considered the admissibility of BWS based on the facts of each particular case, not the general nature of a case. For example, BWS has been admitted to demonstrate why a victim of abuse might recant her allegations against her abuser, *Dausch v. State,* 616 N.E.2d 13 (Ind.1993); to refute a defendant's testimony that he and the victim had a friendly relationship prior to her death, *Isaacs,* 659 N.E.2d at 1041; and as a mitigating factor for a trial court to consider when sentencing a woman for killing her abuser, *Allen v. State,* 566 N.E.2d 1047 (Ind.Ct.App. 1991). Although this court has previously prevented the admission of BWS evidence, we did so because the evidence was not sufficient to support it, not because of the lack of a self-defense claim. *Fultz v. State,* 439 N.E.2d 659, 662 (Ind.Ct.App.1982) (defendant could not admit evidence of prior severe beating by victim because she failed to present appreciable evidence of victim's aggression).[5] These cases demonstrate that

---

**5.** Although *Fultz* has not been specifically overruled in Indiana, its validity is questionable given the current state of the law regarding BWS. In *Fultz,* the defendant was convicted of manslaughter for killing her husband. During trial, the defendant sought to introduce evidence of prior severe beatings by her husband to substantiate her claim of self-defense. On appeal, this court held that because the defendant did not present evidence of her husband's aggression immediately prior to his death, the evidence of his prior acts of violence was not admissible. *Fultz,* 439 N.E.2d at 662.

Nevertheless, other jurisdictions have recognized the admissibility of BWS to explain why a

woman who has been battered could perceive that she was in imminent danger, even without a contemporaneous act of aggression by the victim. *See Bechtel v. State,* 840 P.2d 1, 10–12 (Okla. Crim.App.1992) (BWS evidence relevant and necessary at trial of woman who killed husband after he passed out to show how experience as battered woman affects her perceptions of danger, its imminence, and what actions are necessary to protect herself as well as the reasonableness of those perceptions); *People v. Minnis,* 118 Ill.App.3d 345, 74 Ill.Dec. 179, 455 N.E.2d 209, 217–18 (1983) (evidence of BWS admissible to explain woman's conduct not only at time of batterer's death, but also her actions in dismem-

the presence of a self-defense issue is not the determinative factor in deciding the admissibility of BWS. In fact, in *Isaacs*, our supreme court held that evidence of BWS was admissible "so long as it is relevant." *Isaacs*, 659 N.E.2d at 1041, *citing People v. Christel*, 449 Mich. 578, 537 N.W.2d 194, 201–05 (1995).

We also note that our holding today is consistent with the only other jurisdiction which has considered this issue. In *State v. Mott*, 183 Ariz. 191, 901 P.2d 1221 (App. 1995), the defendant was convicted of child abuse and murder after her child was murdered by the defendant's boyfriend. During trial, the trial court excluded the defendant's expert testimony regarding BWS and its impact on a woman's ability to make decisions and to protect her children. *Id.* 901 P.2d at 1223. On appeal, the State argued that the expert's testimony was inadmissible because it was "not relevant to any recognized defense." *Id.* 901 P.2d at 1224. The appellate court rejected this theory, holding that the trial court erred because:

> [T]he character traits of battered women and the presence of those traits in Mott is relevant and admissible to the charged offenses because it provides evidence probative of Mott's behavior and, if accepted by the jury, would negate much of the evidence the state relied upon to show that Mott acted knowingly or intentionally.

*Id.* The court further found that by excluding this testimony, the trial court effectively denied the defendant the opportunity to present evidence essential to her defense. *Id.* 901 P.2d at 1225. For these reasons, the Arizona court set aside the defendant's convictions.

Similarly, Barrett was denied the opportunity to present evidence essential to her defense. This opportunity is mandated by the Sixth Amendment to the U.S. Constitution which guarantees defendants the right to present evidence and witnesses on their own behalf. *Smiley v. State*, 649 N.E.2d 697, 699 (Ind.Ct.App.1995), *trans. denied.* As the U.S. Supreme Court noted in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967):

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

A defendant accused of knowingly or intentionally committing a crime is entitled to present evidence in her own defense to negate that mental state. As a result, we reverse Barrett's conviction and sentence for neglect of a dependent causing serious bodily injury.[6]

## II. Jury Instructions [7]

Next, Barrett contends that the trial court erred in instructing the jury. Specifically, Barrett argues that the court erroneously refused her tendered instruction on BWS and improperly instructed the jury on the definition of "knowing."

■ A trial court has the discretion to give or refuse to give a jury instruction. *Crabtree v. State*, 547 N.E.2d 286, 292 (Ind. Ct.App.1989), *trans. denied.* We review the

---

bering him and disposing of his body parts at various locations around town). However, this issue has not been raised in Indiana and, as a result, *Fultz* remains good law.

**6.** During oral argument on December 9, 1996, in Indianapolis, Indiana, the State also argued that the expert's testimony regarding BWS was inadmissible because Barrett had not proven that she was a battered woman. While we find this argument perplexing in that the trial court precluded Barrett from presenting evidence that she was a battered woman, it is not necessary for us to

consider it. Inasmuch as Barrett's expert was prepared to testify that Barrett was a battered woman, this testimony is sufficient to raise a question of fact regarding Barrett's battered woman status. Thus, it was within the province of the jury to decide the weight to be given to the expert's testimony. *Woodcox v. State*, 591 N.E.2d 1019, 1027 (Ind.1992).

**7.** Although our resolution of the first issue makes the discussion of Barrett's other issues unnecessary, we will address those issues because they are likely to recur on remand.

trial court's decision for an abuse of discretion. *Id.* When making our determination, we consider: 1) whether there is evidence to support giving the instruction; 2) whether the substance of the tendered instruction is covered by other instructions; and 3) whether the instruction is a proper statement of the law. *Warthen v. State,* 588 N.E.2d 545, 546–47 (Ind.Ct.App.1992).

### A. Battered Women's Syndrome Instruction

■ During trial, Barrett tendered the following instruction on BWS:

> It is a defense to a prosecution of neglect of a dependent resulting in serious bodily injury that at the time of the neglect there was a reasonable apprehension in the mind of the defendant that acting to stop or prevent the neglect or endangerment would result in substantial bodily harm to the defendant or the child in retaliation.

R. at 342. The trial court refused the instruction on the basis that it was not authorized or justified under Indiana law.

As we determined above, BWS is relevant and admissible in a neglect of a dependent case to negate a defendant's intent to commit the crime charged. In addition, the evidence offered by Barrett's expert witness sufficiently supported giving an instruction on BWS. Nevertheless, the instruction tendered by Barrett is not a correct statement of the law. As we have held, evidence of BWS is relevant to establish Barrett's state of mind at the time of the offense. The evidence, however, is solely admissible to refute the State's evidence that Barrett acted knowingly or intentionally. It is not an affirmative defense to the crime charged as asserted by Barrett in her proposed instruction. As a result, while we believe that it is appropriate to instruct the jury on BWS, we cannot say that the trial court erred in refusing Barrett's tendered instruction.

### B. "Knowingly" Instruction

■ Additionally, Barrett claims that the trial court incorrectly instructed the jury on the definition of "knowingly." Barrett offered the following instruction:

The proof required to show that the defendant acted knowingly is based on her subjective awareness of a high probability that she placed her child in a dangerous situation. The proof is not whether a reasonable person in circumstances similar to the defendant's would have acted similarly, but rather, whether this particular defendant was aware of a high probability that she placed her child in a dangerous situation which resulted in serious bodily injury. R. at 343. Over Barrett's objection, the trial court deleted the second sentence of the tendered instruction and instructed the jury only on the first sentence. R. at 1899. According to Barrett, the trial court's instruction was incomplete in that it failed to require the jury to find that Barrett herself was aware that Sherwood would harm Hope. Appellant's Brief at 21.

Although the second sentence of Barrett's tendered instruction is a correct statement of the law, we cannot say that the trial court erred in refusing to elaborate on the definition of "subjective awareness." The trial court has a duty to give definitional instructions only if the words are of a technical or legal meaning normally not understood by jurors unversed in the law. *State v. Magnuson,* 488 N.E.2d 743, 749 (Ind.Ct.App.1986), *trans. denied.* Barrett has offered no evidence demonstrating that the definition of the word subjective has a technical or legal meaning beyond the comprehension of the average juror. As a result, the trial court did not err in declining to give the second part of Barrett's proposed instruction.

### III. Voir Dire

■ Next, Barrett contends that the trial court erred by refusing her request to individually voir dire the jury regarding each juror's exposure to pre-trial publicity. Prior to trial, a newspaper printed an article which revealed that two of Barrett's children had been adjudicated CHINS and removed from her care during the previous year. According to Barrett, because she was unable to question the jury regarding their exposure to the article, she was unable to substantiate her motion for change of venue due to pre-trial publicity.

The trial court has broad discretionary power in regulating the form and substance of voir dire examination. *Brown v. State,* 563 N.E.2d 103, 105 (Ind.1990). Our supreme court has generally rejected the notion that individualized, sequestered voir dire is required in any case. *Lowery v. State,* 547 N.E.2d 1046, 1049 (Ind.1989), *cert. denied,* 498 U.S. 881, 111 S.Ct. 217, 112 L.Ed.2d 176 (1990). However, individual voir dire of prospective jurors may be required where the circumstances are highly unusual or potentially damaging to the defendant. *Brown,* 563 N.E.2d at 105.

In the instant case, we cannot say that the newspaper article regarding the CHINS proceedings was either highly unusual or potentially damaging to Barrett such that individualized voir dire was necessary. Barrett did not present the newspaper article to the trial court; nor is it included in the record on appeal. Further, Barrett did not indicate in which publication the article was printed or its circulation. As a result, we are unable to review the likelihood that the article prejudiced the jury pool.

Furthermore, the trial court instructed the jury as follows:

> Some of you may have read or heard about this case. What may have been stated about his case is not evidence, nor could it ever be evidence for there are none of the checks and balances in the presentation of a news story that must be present in a courtroom.... Each of you must disregard anything and everything you may have read or heard about his case thus far and base your decision in this case solely upon what you see and hear in this courtroom only....

R. at 474–75. We presume that the jury follows the trial court's instructions. *Pruitt v. State,* 622 N.E.2d 469, 473 (Ind.1993). Under these circumstances, we find no error.[8]

### *IV. Conclusion*

In sum, we find that the trial court erred in determining that Barrett's evidence of BWS was irrelevant and inadmissible in a

case involving the neglect of a dependent. As a result, we reverse Barrett's conviction and sentence for neglect of a dependent resulting in serious bodily injury and remand to the trial court for proceedings consistent with this opinion. Additionally, we find that the trial court erred in refusing to give an instruction on BWS, but that it did not err in refusing the instruction tendered by Barrett. Finally, we find that the trial court did not err in refusing Barrett's tendered instruction on the definition of knowingly or her request to individually voir dire the jury pool.

Judgment reversed and remanded.

SHARPNACK, C.J., and ROBERTSON, J., concur.

---

**8.** Barrett also contends that the trial court erred in sentencing in that it impermissibly relied on elements of the crime charged to justify an en-

hanced sentence. Because we vacate Barrett's conviction and sentence, we need not address this issue.