**Julie MARLEY, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

**No. 49A02–9908–CR–617.**

Court of Appeals of Indiana.

June 8, 2000.

John Pinnow, Greenwood, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Randi E. Froug, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

DARDEN, Judge

### STATEMENT OF THE CASE

Julie Marley (hereinafter, "Marley") appeals the trial court's interlocutory order concerning her presentation of certain evidence.

We affirm.

### ISSUES

1. Whether the trial court erroneously ordered Marley to proceed under the effects of battery statute in order to present her Battered Women's Syndrome (hereinafter, "BWS") evidence.

2. Whether the trial court erroneously granted the State's motion in limine to exclude a videotape of Marley engaging in multiple sexual acts with the victim she is accused of murdering.

### FACTS

After what 31 year old Marley described as sixteen hours of her "drinking without interruption" on a night in June of 1997, (R. 144), 71 year-old Donald Marley (hereinafter, "Donald") was dead of blunt force trauma to the head, a stab wound to his chest, and strangulation. As a child, Marley had understood Donald to be her blood uncle; when she was 14, he was convicted of molesting her, and she learned that he was actually her step-uncle by marriage. A neighbor, Gloria Smalling (hereinafter, "Gloria"), who was visiting the Marley apartment that evening, suffered a fractured neck, fractured finger, facial fractures, contusions on the head, bruising over her entire upper body, and multiple broken and knocked out teeth. Marley was charged with having murdered Donald by striking him repeatedly with a hammer, stabbing him with a knife, and manually strangling him. She was also charged with having attempted to murder Gloria, by manually strangling her and striking her in the head with a hammer. She was further charged with criminal deviate con-

duct for having forced Gloria to perform deviate sexual conduct on Donald. And, finally, she was charged with two counts of confinement, one with respect to each victim.

Marley filed no notice of her intent to rely on an insanity defense. Nevertheless, Marley's counsel had her examined by Dr. Bret Ferraro, a psychologist, who diagnosed Marley as suffering from Post–Traumatic Stress Disorder (hereinafter, PTSD)[1]—as well as other mental disorders[2]—at the time she killed Donald. Dr. Ferraro's report summarized the traumatic history of Marley's life, which included her possible molestation as a young child and her established molestation at age fourteen by Donald and her subsequent, continued relationship with Donald as an adult. According to the report, Marley was living with him at the time he was killed. Ferraro found it "likely" that the traumas in Marley's life led her to be in a dissociative state during the violence that left Donald dead and Gloria seriously injured. (R. 152).

The State filed a motion in limine seeking to preclude Marley's introduction of evidence from Dr. Ferraro's examination because no notice of an insanity defense had been filed. The State's motion also asked that Marley not be allowed to introduce a videotape of her engaged in various sex acts with Donald. In response, Marley argued that she only wished to introduce the Ferraro evidence to show "a lack of intent to murder," whether "she ha[d] the requisite intent." (R. 259, 264). As to the videotape, Marley contended it was relevant to show her dissociative conduct.

The trial court conducted an extensive hearing and heard arguments on the State's motion in addition to testimony from Dr. Ferraro. According to Dr. Ferraro, BWS is not a psychiatric diagnosis, but the PTSD, dysthemia, polysubstance abuse, and personality disorder with which

---

1. "[A] psychiatric condition which is a response to trauma." (R. 362).

2. Dysthemia, polysubstance abuse, and mixed personality disorder. (R. 151).

he had diagnosed Marley are. Dr. Ferraro explained that Marley had a history of trauma, not only sexual abuse at the hands of Donald Marley but also "severe physical abuse and emotional abuse throughout her life." (R. 367). Dr. Ferraro opined that when Donald refused to admit that night that he had wronged her by molesting her and instead stated that she had "wanted it," a "flood of emotion" may have triggered a "kind of loss of consciousness" or dissociation in Marley. (R. 366).

The trial court denied the State's motion to preclude Ferraro's testimony, ruling that his testimony was relevant and admissible if the defense filed notice of a defense specified under the effects of battery statute, Ind.Code § 35–41–3–11. The court indicated that Marley could file this notice belatedly. Marley filed what she characterized as a "court ordered" notice stating that she would proceed under both Effects of Battery defenses: insanity and self-defense, but the filing also contained ten pages of argument as to why she should not be restricted to proceeding under the Effects of Battery statute. (R. 129). Marley subsequently filed a "2nd court ordered" notice of her intent to raise only an insanity defense, (R. 191), in which she argued for four pages that she should not have to proceed under the Effects statute.

Pursuant to the insanity statutes, the trial court appointed two experts—a psychiatrist and a neuropsychologist—to assess Marley's mental state. The experts reported to the trial court that Marley suffered from a variety of mental disorders.

On the issue of the videotape, the State argued that there existed "a huge [Indiana Evidence Rule] 403 consideration," (R. 405), and that no evidentiary foundation could be established as to when the sexual acts were videotaped. Marley's counsel conceded that "[no one] knows when that was made." (R. 375). The trial court, in what it emphasized was "only a ruling in limine" because Marley might later "figure out how to lay a foundation," (R. 408),

granted the State's preliminary motion to exclude the videotape.

Upon Marley's request, the trial court certified for interlocutory appeal its order requiring her to proceed under the Effects of Battery statute and excluding the videotape, and we have accepted interlocutory jurisdiction thereof.

## DECISION

### 1. Effects of Battery Statute

Our legislature has defined "effects of battery" and provided a procedural framework for its use as evidence in Ind. Code §§ 35–41–1–3.3 and 35–41–3–11. The definition provides that "effects of battery" is

a psychological condition of an individual who has suffered repeated physical or sexual abuse inflicted by another individual who is the

(1) victim of an alleged crime for which the abused individual is charged in a pending prosecution; and

(2) abused individual's:

 (A) spouse or former spouse;

 (B) parent;

 (C) guardian or former guardian;

 (D) custodian or former custodian; or

 (E) cohabitant or former cohabitant.

I.C. § 35–41–1–3.3. The law then provides that when an individual is charged with a crime involving the use of force against a person, and raises the issue of having been "at the time of the alleged crime suffering from the effects of battery as a result of the past course of conduct of the individual who is the victim of the alleged crime," such a defendant "raises the issue that the defendant was not responsible as a result of mental disease or defect" under the insanity statute. I.C. § 35–41–3–11. Alternatively, such a defendant may "claim to have used justifiable reasonable force" under the law of self-defense, in which case written notice thereof must be filed with the trial court. *Id.*

Marley contends that the trial court erred in its interlocutory ruling that she could only present her BWS evidence "within the confines of the Effects of Battery statute." Marley's Brief at 22. In support of her first argument in that regard, she outlines a listing of her potential defenses. How a listing of potential defenses, and brief discussion of each, constitutes an argument of trial court error is unclear. Nevertheless, we note her first "potential defense" that "[h]er conduct was not voluntary because she had a dissociative event and was not conscious of what she was doing." Marley's Brief at 22. Marley cites *McClain v. State*, 678 N.E.2d 104 (Ind.1997), to support admission of her evidence that her conduct was not voluntary because she was in a dissociative state. *McClain* did hold that it was error for the trial court to not admit evidence as to the voluntariness of the defendant's conduct alleged to be criminal. *Id.* However, the *McClain* defendant's claim that his conduct was not voluntary due to automatism was not paired with the contention that he suffered from an unhealthy mind. Indeed, our supreme court specifically stated, "To the extent involuntary behavior is contended to result from a mental disease or defect, the insanity statute would apply." *Id.* at 108. Thus, *McClain* does not support her contention that she should be able to present the evidence from Dr. Ferraro as to her mental state without pursuing an insanity defense.

■ Marley also asserts the "potential defense" that "she did not act knowingly or intentionally" to commit the charged offenses. Marley's Brief at 22. In *Barrett v. State*, 675 N.E.2d 1112, 1116 (Ind.Ct. App.1996), *trans. denied*, we held that evidence of Battered Women's Syndrome (BWS) was admissible in the defense of a mother charged with criminal neglect when her child died at the hands of her live-in boyfriend. Specifically, such evidence was "relevant and necessary to determine [the mother's] mental state and, therefore, whether she acted knowingly or intentionally in neglecting her dependent." *Id.* at 1116. Thus, *Barrett* requires that a trial court admit BWS evidence on the issue of whether a defendant acted knowingly or intentionally.

■ As Marley argues, due process requires that the prosecution, not the defendant, bear the burden of proving every element of a criminal offense. *See In re Winship*, 397 U.S. 358, 364, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970). However, federal and state legislatures may reallocate the burden of proof by labeling elements as affirmative defenses and stating that criminal defendants bear the burden of proving those defenses. *U.S. v. Talbott*, 78 F.3d 1183, 1185 (7th Cir.1996). An affirmative defense must be sharply distinguished from a simple "defense," or a simple negation of one of the elements of the offense, because the defendant never bears the burden of proof on the elements of the offense. *U.S. v. Petty*, 132 F.3d 373, 378 (7th Cir.1997). An affirmative defense goes beyond the elements of the offense to prove facts which somehow remove the defendant from the statutory threat of criminal liability. *Id.* Such would be the case for the defense of insanity or self defense.

Had Marley argued that she only wanted to introduce evidence about herself and BWS, it would have been error to not allow that evidence for the finder of fact's consideration on the element of her intent.[3] However, Marley never so argued. Dr. Ferraro's report discusses extensively the PTSD diagnosis, which (unlike BWS) is a recognized mental disorder. He explains his opinion that Marley may have been in a dissociative state in the context of PTSD. And it is the evidence that "she had a

---

3. This would be evidence about what BWS is, such as described in *Barrett*, 675 N.E.2d at 1112 n. 3, along with evidence about events in Marley's history that created the likelihood that she suffered therefrom. Our review of the report from Dr. Ferraro does not reveal that he ever referred to BWS, although he does report events in Marley's history that could suggest its possibility.

dissociative event and was not conscious of what she was doing," or that BWS "affected her state of mind so that she did not act knowingly or intentionally in committing the charged offenses," that Marley sought to have admitted. Marley's Brief at 22. Therefore, the trial court did not err in requiring her to present evidence of her BWS pursuant to the procedure established for BWS evidence as part of an insanity defense.

Marley next argues that the trial court erred in requiring that in order for her to present BWS evidence, she must proceed under the Effects of Battery statute because the incident for which she was charged took place several weeks before the effective date of the statute. Thus, she contends, application of the law is ex post facto and unconstitutional as applied to her in that it "deprives her of a defense that was available at the time of the crime," which is impermissible pursuant to *Dobbert v. Florida*, 432 U.S. 282, 292, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1997), and *Crawford v. State*, 669 N.E.2d 141, 150 (Ind.1996). Marley's Brief at 28. Specifically, she claims to have been deprived of the BWS defense, which was "recognized as a defense at the time of the charged offense" in *Barrett. Id.*

We do not read *Barrett* to "recognize" or establish BWS as a defense to a crime. Rather, *Barrett* held that BWS could be admissible evidence. Moreover, the trial court's ruling here did not deprive Marley of a defense that relies on BWS evidence; it simply required that in the context of her proffered evidence herein, she present such evidence via the procedure provided in the Effects of Battery statute.

However, Marley also contends that the trial court's order, by requiring her to "present her [BWS] evidence solely under the aegis of self defense or insanity," deprives her of her constitutional right to present a defense. *Id.* at 31. Her argument necessarily implies that her constitutional right to present a defense encompasses the ability to do so in any fashion she chooses; a proposition for which she proffers no authority.

 Finally, Marley asserts that the trial court ruling contravenes proper statutory construction of the Effects of Battery statutes. Specifically, she contends that the definition regarding the possible relationships between the victim and the defendant (i.e., parent, or present/former spouse, guardian, custodian, or cohabitant) would not apply to either victim, Donald Marley or Gloria Smalling. According to the history provided to Dr. Ferraro, Marley had been living with Donald for several months. Marley suggests that "cohabitant" in the statute should mean those living together as husband and wife, as defined in BLACK'S LAW DICTIONARY, and "equate with live-in boyfriend or girlfriend," which is not the case here. Marley's Brief at 34. We find such a definition to be too narrow, inasmuch as the legislature specified both guardian and custodian before reaching the category of cohabitant. Therefore, we conclude that the legislature did not intend "cohabitant" to *necessarily* mean a sexual partner, and, thus, Donald was a cohabitant as to Marley. With respect to her argument that the statute cannot apply to BWS evidence with respect to the offenses she is alleged to have committed against Gloria, we fail to comprehend how she is prejudiced by the admission of such evidence.

 An admissibility determination by the trial court is reviewed on appeal for abuse of discretion and will be reversed only where the decision is clearly against the logic and effect of the facts and circumstances. *Jackson v. State*, 697 N.E.2d 53, 54 (Ind.1998). The trial court did not abuse its discretion with respect to the admission of evidence in its ruling that Marley could not introduce certain evidence she sought to admit unless she did so pursuant to the Effects of Battery statutes.

## 2. *Videotape*

■ Marley contends that the trial court erred in preliminarily ruling that a more than one hundred minute videotape of her and Donald Marley engaged in a series of sexual activities was inadmissible. The trial court granted the State's motion in limine in that regard

> because of the following Rule 403 analysis: the defense could not lay a foundation for it; the defense could not authenticate it; we do not know the date the video tape was made, or the circumstances of the sexual encounter; it would be distracting to the jury; and it would cause an undue consumption of time.

(R. 29). Ind. Evidence Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by consideration of undue delay, or needless presentation of cumulative evidence."

Marley argues that she could establish the necessary foundation for admission of the tape by her own testimony. However, as the State notes, she gave no such testimony to the trial court.

The gravamen of Marley's argument on appeal, as well as her trial court argument, is the asserted great probative value of the videotape. Specifically, she contends the videotape corroborates Dr. Ferraro's diagnosis by showing the "detachment, hopelessness and flatness" of her behavior. Marley's Brief at 44. We cannot agree. Despite the fact that Marley appears for virtually the entire one hour and forty-five minutes of the videotape, her face is visible for scarcely more than a few minutes altogether. How a conclusion can be reached as to the state of Marley's mind, and as to whether she was subject to being in a dissociative state, by viewing the back of her head or other body parts is not apparent to us. We conclude that the videotape's probative value to show dissociative conduct by Marley is minimal. Moreover,

we find no error in the trial court's ruling that the potential of the videotape to prejudice the jury against the victim far exceeds its probative value.

We affirm.

MATTINGLY, J., concurs.

BROOK, J., dissents with separate opinion.

## BROOK, Judge, dissenting.

I respectfully disagree with the majority's resolution of Marley's statutory construction claim, which I believe to be dispositive of her appeal. Initially, I would observe that the Effects of Battery Insanity Statute, Indiana Code Section 35–41–3–11, is a particular species of the insanity defense [4] that applies only when a "defendant in a prosecution raises the issue that the defendant was at the time of the alleged crime suffering from the effects of battery as a result of the past course of conduct of the individual who is the victim of the alleged crime." IND.CODE § 35–41–3–11(b)(1). Our legislature has defined "effects of battery" as

> a psychological condition of an individual who has suffered repeated physical or sexual abuse inflicted by another individual who is the
>
> (1) victim of an alleged crime for which the abused individual is charged in a pending prosecution; and
>
> (2) abused individual's:
>> (A) spouse or former spouse;
>> (B) parent;
>> (C) guardian or former guardian;
>> (D) custodian or former custodian; or
>> (E) cohabitant or former cohabitant.

IND.CODE § 35–41–1–3.3. Contrary to the majority, I am unable to conclude that either of Marley's victims in this unfortunate incident, Donald Marley ("Donald") or Gloria Smalling ("Smalling"), falls within any of the relationships identified in Indiana Code Section 35–41–1–3.3. As

---

**4.** *See* IND.CODE § 35–41–3–5.

such, I would conclude that the trial court committed reversible error when it required Marley to present evidence of battered woman's syndrome ("BWS") within the framework of Indiana Code Section 35–41–3–11 when, by definition, she did not suffer from a mental disease or defect specifically brought about by the "effects of battery."

Where a statute has not previously been construed, as here, the interpretation is controlled by the express language of the statute and the general rules of statutory construction. *Blackmon v. Duckworth,* 675 N.E.2d 349, 351 (Ind.Ct.App.1996). The threshold inquiry in cases of statutory interpretation is whether the statute is ambiguous. *Sullivan v. Day,* 661 N.E.2d 848, 853 (Ind.Ct.App.1996), *vacated in part on other grounds,* 681 N.E.2d 713 (Ind. 1997). Only when a statute is ambiguous is it susceptible to judicial interpretation. *Id.*

The evidence is undisputed that Donald was never Marley's spouse, parent, guardian, or custodian. Therefore, in order for the Effects of Battery Insanity Statute to apply, he would have to be Marley's "cohabitant or former cohabitant." While the record indicates that Marley lived with Donald for several months prior to his death, and thus, technically inhabited the same residence during this period, I cannot agree that her doing so constituted a "cohabitation" within the intended scope of Indiana Code Section 35–41–1–3.3.

When a statute is susceptible of more than one reasonable interpretation, we endeavor to determine and give effect to the intent of the legislature. *Blackmon,* 675 N.E.2d at 351–52. In effecting legislative intent, undefined words in a statute are to be given their "plain, ordinary and usual meaning." *State v. D.M.Z.,* 674 N.E.2d 585, 588 (Ind.Ct.App.1996), *trans. denied.* Courts may consult English language dictionaries to ascertain the plain and ordinary meaning of a statutory term. *Id.* BLACK'S LAW DICTIONARY 260 (6th ed. 1990) defines "cohabitation" as follows:

To live together as husband and wife. The mutual assumption of those marital rights, duties and obligations which are usually manifested by married people, including but not necessarily dependent on sexual relations.

Similarly, THE AMERICAN HERITAGE DICTIONARY 289 (2d ed. 1991) defines "cohabit" as "[t]o live together as husband and wife" or "[t]o live together in a sexual relationship when not legally married." Clearly, the plain and ordinary meaning of "cohabitant" imparts a limited application to those living together in a quasi-marital or sexual relationship.

This interpretation is further bolstered by the long-standing treatment of the terms "cohabitant," "cohabitate," and "cohabitation" by our courts and the legislature. Indiana cases utilize those words solely in the context of marital relation and dissolution claims and actions involving parties who have lived together as husband and wife. *See, e.g., Bright v. Kuehl,* 650 N.E.2d 311, 315 (Ind.Ct.App. 1995) (holding that a party who "cohabitates with another without subsequent marriage" is entitled to relief for contributions made during "cohabitation" upon a showing of an express contract or viable equitable theory such as implied contract or unjust enrichment); *Beach v. Beach,* 642 N.E.2d 269, 280 (Ind.Ct.App. 1994) (addressing termination of maintenance provision in dissolution decree requiring former wife to notify former husband in the event that she remarry or "cohabitate with a male"); *Oliver v. Estate of Oliver,* 554 N.E.2d 8, 11 (Ind.Ct. App.1990) (interpreting IND.CODE § 29–1–2–14, the adultery/forfeiture of rights statute, and holding that the trial court may infer "adulterous cohabitation" from circumstantial evidence when determining whether spouse living in adultery at time of other spouse's death should be prohibited from taking any part of the estate); *Dunlop v. Dunlop,* 101 Ind.App. 43, 198

N.E. 95, 98 (1935) (holding that "cohabitation" does not itself constitute common law marriage, but is merely evidence of marriage). Indeed, when common law marriages were recognized in Indiana, this court observed, "Cohabitation will be inferred, nothing appearing to the contrary, from the fact of the living together of husband and wife. We use the terms 'cohabit' and 'cohabitation' as implying sexual intercourse." *Graves v. Graves,* 123 Ind.App. 618, 621, 112 N.E.2d 869, 870 (1953).

A review of other statutes containing "cohabit" within their provisions also reflects a legislative intent that such term be used in the limited context of marital and quasi-marital relations. *See, e.g.,* IND.CODE § 31–11–10–2 (governing marriages which are voidable on the ground that it was brought about through fraud; "[i]t is a defense in an action brought under this section that, after the discovery of the alleged fraud, the alleged victim continued to cohabit with the other party to the marriage."); IND.CODE § 31–16–14–1 (governing actions for support of dependants by dependant spouse; grounds include when the other spouse "joins a sect or denomination that requires a renunciation of the marriage or that forbids the spouses to cohabit as husband and wife"). Likewise, I believe that the legislature, in deliberately choosing the word "cohabitant" in defining "effects of battery," was fully aware of the term's historical usage and distinct legal implications. *Cf. Holmes v. ACandS, Inc.,* 709 N.E.2d 36, 39 (Ind.Ct. App.1999) (observing that when a legislature enacts a statute, we presume it is aware of existing statutes in the same area), *on rehearing in part,* 711 N.E.2d 1289 (Ind.Ct.App.1999), *trans. denied; Thompson v. State,* 617 N.E.2d 576, 579 (Ind.Ct.App.1993) (recognizing presumption that the legislature is aware of the common law and does not intend to make any change therein beyond what it de-

clares either in express terms or by unmistakable implication), *trans. denied; see also Burks v. Bolerjack,* 427 N.E.2d 887, 890 (Ind.1981) (noting that the language employed in a statute is deemed to have been used intentionally).

Thus, in keeping with the foregoing principles of statutory construction, the term "cohabitant" appears to be one of limited application, meaning, as Marley suggests, a person who lives with another as husband and wife or in a comparable sexual relationship. The majority's much broader construction encompasses *anyone* living together under the same roof—friends, acquaintances, and roommates—relationships which the legislature surely did not intend to elevate to the same level as a spouse, guardian, or custodian. *See Blackmon,* 675 N.E.2d 349 (noting that statute must be construed in such a way as to prevent absurdity and hardship).

Accordingly, I would hold that the trial court's application of the Effects of Battery Insanity Statute in this case was error because Marley and Donald were not "cohabitants" within the meaning of Indiana Code Section 35–41–1–3.3. The error is even clearer with respect to Smalling, who was merely Donald's neighbor at the time of the incident and had no relation to Marley, as a "cohabitant" or otherwise. In the absence of a mental disease or defect specifically brought about by the "effects of battery," I respectfully dissent from the majority and would reverse the trial court's application of Indiana Code Section 35–41–3–11 in accordance with the principles set forth in this opinion.